**Emma Chabot, Plaintiff-Appellee, v. Timothy D. Kelly, Administrator With the Will Annexed of the Estate of George H. Shannon, Deceased, as Legatee and Devisee Under the Last Will and Testament of George H. Shannon, Deceased, Defendant-Appellant.**

**Gen. No. 50,079.**

First District, Fourth Division.

June 22, 1966.

Rehearing denied July 18, 1966.

David S. Minor, of Chicago (Myer H. Gladstone, of counsel), for appellant.

Daniel A. Costigan, Carleton L. Banker and Charles M. O'Brien, of Chicago (Daniel A. Costigan, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

Plaintiff's complaint sought specific performance of an alleged oral agreement entered into by her and George H. Shannon during his lifetime. She claimed that he had agreed to furnish her with board, room and clothing, and to make a will naming her as sole beneficiary, provided she advance money to him so that he could acquire a rooming house at 27 West Superior Street, Chicago, and provided also that she operate and manage the rooming house for him. She alleged performance on her part and failure on his. Defendant, who is the administrator and principal beneficiary under the will of Shannon, filed

an answer denying the agreement alleged in the complaint and further alleging that plaintiff had an adequate remedy at law. The cause was referred to a special master in chancery who found and reported that plaintiff had proved her case by clear and convincing evidence. The court's decree overruled defendant's exceptions to the master's report, ratified and confirmed the master's findings of fact and conclusions of law, and directed specific performance of the contract. It vested the entire estate of Shannon in the plaintiff, directed defendant to execute all instruments necessary to effectuate that result, and ordered defendant to make a full accounting to plaintiff of his operation of the real estate and other property of the decedent. Defendant has appealed.

 Such a decree as this can only be justified if it constitutes the exercise of sound judicial discretion, based upon clear and conclusive proof of the alleged oral contract. Hickey v. Hickey, 374 Ill 614, 621, 622, 30 NE 2d 423; Harper v. Kennedy, 15 Ill2d 46, 52, 153 NE2d 801. The fact that the decedent had executed a will inconsistent with plaintiff's contention is a circumstance to be considered, but it would not deprive plaintiff of her right to enforce the alleged contract, assuming, of course, that she were otherwise able to meet the requirement of establishing its existence by clear, explicit and convincing evidence and by showing performance on her part. Chambers v. Appel, 392 Ill 294, 305, 64 NE2d 511. We must therefore examine the evidence.

TESTIMONY OF PLAINTIFF'S WITNESSES

*Fred N. Chabot:*

He is the son of the plaintiff and first met Shannon in November 1942 at 27 West Superior Street. He

stayed there a week and observed that his mother was cleaning the place and collecting money from tenants. After returning to his home in Minnesota, he came back to Chicago in April 1944. On this visit Shannon told him that he (Shannon) had a chance to buy the place at 27 West Superior Street. Shannon also told him at that time that he need not worry about his mother because she was well taken care of; that "it's going to be left to her if anything happens to me so she won't be stuck with anything"; and that a will had been made to take care of his mother. Mrs. Chabot was fifty-one years of age at that time. Chabot left for the service after a two-day visit on this occasion. On his next visit, in March 1948, he observed that his mother was being physically abused by Shannon and that Shannon was drinking quite heavily. Shannon again told him, however, not to worry about his mother, "the will is made out to her. She gets the whole place." His mother and Shannon were engaged to be married all the time from 1945 until December 1947. During the period of time he was in the service and thereafter, Chabot sent his mother very little money—just on her birthdays and Christmas.

*Walter A. Werner:*

He is an attorney who first met Shannon in Miami in 1924. He saw him in Chicago in the latter part of 1942, at which time he was asked to draw up a will for him. Shannon said that Mrs. Chabot had been taking care of the rooming house and had advanced him $3,000, and that he wanted to protect her in case of his death. He said he wanted the will to state that she was to be his sole legatee and particularly with reference to the rooming house. The date of this will was January 22, 1944. (It is undisputed that this will was properly executed, but was superseded by a will of July 1, 1948 in which decedent left all his property to defendant Kelly.)

154

*Sally Werner:*

She was the wife of Walter A. Werner. She met Shannon at his home on Superior Street in 1944 when she and her husband were looking for an apartment. Shannon told her how well he was doing and that he had gotten a woman who had $3,000 to invest and that this woman, Mrs. Chabot, was doing all the work. He said he wanted to see that she was taken care of. On numerous occasions when she and her husband visited Shannon at the rooming house, she would observe Mrs. Chabot always cleaning and puttering around.

*Mildred Beiker:*

She moved into 27 West Superior Street in August 1946 and lived there four months. During this period she observed Mrs. Chabot going about her duties as housekeeper and manager of the rooming house. Mrs. Chabot would also wait on Shannon's needs and prepare his meals.

*Collis Davis:*

He also was an attorney. Shannon and Mrs. Chabot came to his office in the Spring of 1946 for the purpose of engaging him to represent Shannon in a real estate deal (acquisition of title to the rooming house). Shannon told him that he felt the rooming house business was a good one and he was making money at it; that he had an understanding with Mrs. Chabot that she would do all of the housework and take care of the rooming house for him without any compensation. Shannon also said that he had had some discussion with her and he was making provisions for her in his will; that "he was going to give the whole thing to her—the rooming house, the business, upon his death." The purchase price of the property at 27 West Superior was $7,000 or $7,500. In May or June of 1948, Shannon advised him that he had

had an argument with Mrs. Chabot and that she had filed suit against him and he wanted Davis to represent him. Shannon also said, however, that he had received some money from her and he felt she was entitled to some equitable settlement. He wanted Davis to dispose of the matter amicably. On several occasions when they met thereafter, Shannon was under the influence of liquor to a considerable degree.

*Ida M. Jetley:*

She was in the real estate business. Shannon, accompanied by Mrs. Chabot, visited her office in the Spring of 1942 for the purpose of purchasing some property. He preferred to have Miss Jetley discuss most of the matter with Mrs. Chabot because she (Mrs. Chabot) was going to take care of it entirely for him and he depended on her for making the selection. He said that "eventually it would be Mrs. Chabot's so she is the one who will have to be satisfied." On another occasion, in April 1945, Shannon asked Miss Jetley, who was also a notary public, to assist in a republication of his will of January 22, 1944. On another occasion, in the Spring of 1948, Miss Jetley criticized Shannon for the way he treated Mrs. Chabot, and Shannon replied: "She is getting everything I have, I know she is going to outlive me."

TESTIMONY OF DEFENDANT'S WITNESSES

*Elizabeth DeVilbiss:*

In 1942 she lived in and managed a rooming house under a lease at 27 West Superior Street. Mrs. Chabot lived with her as a roomer for about a year before Shannon purchased the rooming-house lease. The price of the lease was $700, but $400 was to be paid by giving Mrs.

156

DeVilbiss a year's free rent. Shannon also gave her a chattel mortgage (in evidence) to secure the unpaid balance. Shannon further told her that Mrs. Chabot was the new housekeeper; that she was supposed to work for her room and board. Mrs. Chabot told her the same thing. On one occasion she heard Shannon and Mrs. Chabot talking loudly in his room.

*Harry Miller:*

In 1942 he first met Shannon, who talked to him about the rooming house, and said that he had a housekeeper who worked for room and board. Miller moved into the rooming house in 1948 shortly after Mrs. Chabot left the premises. At about this time Shannon said that if anything should happen to him the property would go to Mr. Kelly.

*Hattie E. Nepper:*

She was a good friend and neighbor of Shannon for several years, and he would often come to visit her. Sometimes he would talk about his housekeeper. He said that he only had to pay her room and board and she was not satisfied; that she wanted his home. When Mrs. Nepper said, "Are you going to give it to her? I wish I was single." Shannon replied: "No, I'm going to give it to a friend, a man friend . . . Kelly."

*Patricia Sumner:*

She lived in the rooming house at 27 West Superior Street from 1942 until 1947. Mrs. DeVilbiss was the landlady when she moved in. Mrs. Chabot had a bad financial situation when she first met her. Mrs. Chabot told her that she could not work in a defense plant because her eyes were bad, so she was going to be the housekeeper for her board and room. On another occa-

sion Mrs. Chabot pointed to some clothes she had received from Shannon. In 1946 Mrs. Chabot told her that she was going to sue Shannon for wages. On several occasions she could hear Mrs. Chabot and Shannon arguing in loud voices. Shannon drank quite often.

*Emma Chabot, the plaintiff* (called as an adverse witness under section 60 of the Civil Practice Act) :

She first became acquainted with Shannon the day he took over the lease at 27 West Superior Street. Shortly thereafter, Shannon asked her if she would work and help him pay for it, as he was going to purchase the lease to the premises. He did not have enough money to pay cash. Their understanding was that she would pay the same amount he did. She paid $350 and he paid $350 and they were "in partnership." She never told anyone she expected to sue for wages: "It was mine as well as his so why should I sue him for wages ?"

*Emma Chabot, the plaintiff* (on her own behalf in rebuttal) :

When she lived at the rooming house she did all the housework that was supposed to be done, cleaning work, cooking for Shannon and collecting the rents which Shannon kept. The arrangement between her and Shannon was :

> . . . if I would work for him that he—he did not have any money, but he would give me my room and board and the clothes that I need and he would take care of me, and if something happened to him everything would be mine, if I helped him make a home for both of us.

Asked what she had told a Mr. Smith about her arrangement with Shannon, she replied, "I told him the same as I told everybody else, that Mr. Shannon called it a part-

158

nership; if I would help him out everything was mine." *
She advanced to Shannon a total of $3,600, but her records were stolen by a purse snatcher after Shannon's death. She never told Mrs. Sumner that she had no money. She never told Mrs. Sumner that she was having difficulty getting a job because of her eyes.

## OPINION

 As stated in Holmes v. Ackley, 400 Ill 372, 379, 81 NE2d 178, "[t]he granting of the equitable remedy of specific performance is a matter of sound, judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of the particular case." See also Fierke v. Elgin City Banking Co., 366 Ill 66, 7 NE2d 875; and Holsz v. Stephen, 362 Ill 527, 200 NE2d 601.

 In the case before us we have testimony of disinterested witnesses corroborating the evidence of plaintiff herself, and we have believable testimony concerning statements and actions of the decedent. All in all, the evidence furnishes strong proof that the alleged oral contract was actually made and was being performed by plaintiff until decedent made it impossible for her to continue. This evidence convinced the master; it convinced the chancellor; and it convinces us.

Defendant's contention that plaintiff's arrangement with Shannon was at most a partnership is without merit.

---

* She further testified:

On my deposition I answered questions relating to a conversation with Harry Smith. I told him I was working in partnership with Shannon there.

I testified at that deposition that I had this conversation more than once with Harry Smith and that it was because Mr. Shannon had showed him the will and told him about our affair there, and that I was helping to make a home for both of us, and help him pay bills and ordinary business of the house.

159

Plaintiff's use of the term "partnership" in her testimony was not in the legal sense, but rather to show her substantial interest in the rooming house and her expectation from Shannon's promise. The record adequately discloses that plaintiff was induced to work without monetary reward, only because of the promise of some security in the future. Her advancement of a substantial sum of money to Shannon, and her services over a period of years, not only as housekeeper but also as manager of the rooming house were inadequately compensated by room and board. Proper compensation in such a situation is, in fact, difficult to compute. From the inception of Shannon's acquaintance with plaintiff until May 28, 1948, the date of her departure from the rooming house, Shannon treated plaintiff not as a mere servant, but as an especially fond friend. While their relationship was often turbulent due to the latter's addiction to alcohol, there is no evidence tending to show Shannon's dissatisfaction with plaintiff's performance of their arrangement prior to May 28, 1948. It was only at that time, after Shannon's alcohol habit had rendered plaintiff's further association with him impossible, that he executed another will in which plaintiff was not mentioned, and the property was left to Kelly. We believe the evidence shows this to have been in violation of his oral contract with plaintiff.

■ A further contention of defendant is that specific performance should not have been decreed because plaintiff had an adequate remedy at law. As we have indicated, we do not consider that the facts and circumstances of this case support such a conclusion. We also believe that the case of Abrams v. Schlar, 27 Ill App2d 237, 169 NE2d 583, relied on by defendant as a basis for this point, is clearly distinguishable.

■ Defendant also contends that plaintiff's testimony on rebuttal (to which timely objection was made)

was inadmissible under section 2 of the Evidence Act. Ill Rev Stats (1963), c 51, § 2. This point is without merit, because by calling plaintiff to testify as an adverse witness, defendant waived her incompetency with respect to the matters concerning which he had examined her. She then became competent to testify on her own behalf in regard to the same "transaction." Perkins v. Brown, 400 Ill 490, 496, 497, 81 NE2d 207.

The decree of the Superior Court of Cook County is affirmed.

Affirmed.

DRUCKER, P. J. and McCORMICK, J., concur.