(Nos. 34773, 34877.— ▮▮▮▮▮▮▮▮
Mary Elizabeth Harper *et al.*, Appellees, *vs.* Grace Kennedy, Appellant.

*Opinion filed September 18, 1958—Rehearing denied Nov. 24, 1958.*

N. E. HUTSON, of Monticello, for appellant.

LEMNA & LEE, of Tuscola, for appellees.

Mr. JUSTICE DAVIS delivered the opinion of the court:
This cause comes before us on the consolidation of three
separate appeals from orders of the circuit court of Douglas

County. In order to clarify its present posture, it is necessary to trace the development of the litigation which had its genesis in an action where Charles L. Sharp, now deceased, took judgment by confession on certain notes signed by Martin B. Kennedy, now deceased, and the defendant, Grace Kennedy, his wife. Defendant moved to open the judgment and for leave to plead, and upon denial of the motion appealed to the Appellate Court which reversed the trial court, opened the judgment, and granted such leave. (*Sharp* v. *Kennedy*, 12 Ill. App.2d 353.) In the interim, Sharp died and his executor was substituted in his stead. The executor, together with Sharp's heirs and devisees, filed a complaint for partition of certain real estate owned by Sharp and Martin B. Kennedy as tenants in common. Grace Kennedy, as Martin's sole legatee, devisee and executor, filed answer and counterclaim in the partition action wherein she alleged that Sharp and Martin B. Kennedy had entered into a contract whereby Sharp agreed to cancel the judgment notes by will, and Martin agreed to purchase Sharp's interest in the real estate for $3,500 shortly after Sharp's death. The answer prayed dismissal of the suit for partition, and the counterclaim prayed specific performance of the alleged agreement. The actions were consolidated in the trial court.

After hearing on October 11, 1957, the trial court entered two separate decrees. One ordered that the judgments of $9,881.49 originally entered on the notes remain in full force and effect; the other found that defendant had an option to purchase the property for $3,500 and ordered that she be given 30 days to exercise such option, and that upon her failure to do so, a decree of partition be entered in accordance with the prayer of the complaint.

The defendant took separate appeals to the Appellate Court, which were transferred to this court on the ground that a freehold was involved. The defendant failed to exercise the option within 30 days from the entry of the

decree, and the trial court thereupon entered a decree for partition from which defendant appealed directly to this court. Since it appears that all three appeals revolve around the construction of the alleged agreement between Charles L. Sharp and Martin B. Kennedy, we consolidated them for argument and opinion.

For approximately 20 years prior to 1949, Sharp and Kennedy were partners in a hatchery business, although Sharp did not take an active part in the management of the hatcheries after 1942. On January 31, 1949, they dissolved the partnership pursuant to written agreement, whereby Kennedy purchased Sharp's interest therein for $15,000. This was to be paid by $1,000 in cash; two notes of one Heacock, payable to Kennedy and endorsed by him, amounting to $2,741.54; and five promissory notes for $2,000 and one for $1,258.46, executed by Kennedy, dated January 24, 1949. Each note was to bear interest at the rate of $4\frac{1}{2}$ per cent from January 1, 1951. The first note was to be due on August 1, 1952, and one note was to be due on August 1 of each subsequent year. No evidence was introduced concerning the execution of the notes described in this agreement, but it appears from exhibits in the record that the Kennedys executed four judgment notes payable to Sharp, on January 24, 1949; three in the amount of $1,000 and one in the amount of $1,258.46, maturing on August 1, of 1954, 1955, 1956, and 1957 respectively. Thereafter, on January 1, 1952, they executed four more $1,000 notes payable to Sharp maturing on August 1, of 1958, 1959, 1960 and 1961, respectively, and on August 1, 1953, they executed a further note to Sharp for $646.95, due one year after date. While it does not appear from the record, it is undisputed that the January 1, 1952, notes were given in substitution of past due notes, and that the August 1, 1952, note was for past due interest. There is nothing in the record to indicate that any of the notes mentioned in the dissolution agreement were ever paid.

On January 21, 1952, Kennedy and Sharp executed a certain instrument prepared by Sharp's lawyer. Since its interpretation is the crux of the entire controversy, we set it forth in full.

"THIS AGREEMENT made and entered into this 21st day of January, 1952, by and between Martin B. Kennedy, Party of the First Part, and Charles L. Sharp, Party of the Second Part, witnesseth:

WHEREAS, under the terms of a contract dated the 31st day of January, A.D. 1949, between the parties hereto which dissolved a partnership heretofore carried on between the parties hereto, certain notes were executed by the Party of the First Part in favor of the Party of the Second Part as a part of the consideration of said contract dissolving said partnership.

AND WHEREAS, the Party of the Second Part has this day executed a Last Will and Testament providing for the cancellation of said indebtedness which may be owing by First Party to Second Party upon the death of Second Party.

Now THEREFORE, in consideration of the mutual promises and agreements herein contained, the Party of the First Part agrees that upon the death of the Party of the Second Part, the said First Party will purchase the undivided one-half interest in the following described real estate:

Beginning at the Southwest corner of Lot 9, Block 17 of the original Town, now City of Tuscola, Illinois, thence East 41 feet 3 inches, thence North to the North line of said Lot 9, thence West to the West line of said Lot 9, thence Southwesterly with East line of Park Street, in the City of Tuscola, Illinois, to the place of beginning.

from the Executor of the Last Will and Testament of the Second Party for the sum of $3,500.00, which said sum will be paid within 6 months after the date of the death of said Second Party.

WITNESS our hands and seals the first day and year above written.

THIS AGREEMENT Shall be binding upon our heirs, Executors, Administrators or assigns."

It was stipulated that Sharp's attorney prepared a will for him shortly prior to January 21, 1952, but there is no evidence of the execution or contents of the will. However, upon Sharp's death, a subsequent will dated December 23, 1954, was admitted to probate which made no pro-

vision for the cancellation of any indebtedness of Martin B. Kennedy.

The Kennedys' daughter and son-in-law testified that they visited Sharp in the hospital after the commencement of the suit on the notes, and about three weeks prior to his death. The son-in-law, Keith Hutson, an attorney who appeared in this cause from time to time for his father, attorney of record for Grace Kennedy, testified that he then told Sharp that the institution of the suit on the notes was contrary to the agreement between Sharp and Kennedy; that since Kennedy took care of the major business matters and permitted Sharp to stay home and care for Mrs. Sharp, they had an understanding that if Sharp died first, Kennedy would care for Sharp's wife, and if Kennedy died first, Sharp would care for his wife and children; and that in exchange for Kennedy taking care of the business while Sharp was at home, Sharp would see that Kennedy got the business when he died. The witness further testified that he told Sharp that this agreement was made "so that Buck [Sharp] would have an annual income for his support and maintenance during the rest of his normal life expectancy and then the $3500 paid for the building would take care of the funeral expenses at the time of his death, and Buck [Sharp] said: 'Yes, that's true, but he would have gone along with it if Martin had lived, but now he is dead, and I am not going through with it.' "

Kennedy's daughter testified that between 1942 and 1946, Sharp said to Kennedy, "Martin, you've always been very good to me and I want to be just as good to you." She further testified that at the time of the visit to Sharp in the hospital, Sharp told her of an agreement he had with her father, that if Sharp died first, Kennedy would care for his wife, and if Kennedy died first, Sharp would see that Mrs. Kennedy and the girls were cared for.

Plaintiffs contend that no binding agreement to cancel the indebtedness has been proved, and that the document

of January 21, 1952, is a mere option to purchase. Defendant urges that this instrument is a binding and inseparable contract, and the trial court should have ordered a conveyance of the real estate and cancellation of the indebtedness.

We recognize that a court of equity will enforce a contract to make a will where it is based upon adequate and valid consideration. However, it is well established that such courts will accept with caution evidence offered in support of a contract to make a disposition of property of a deceased person different from that provided by law; that the evidence necessary to support the decree for specific performance must be clear, explicit and convincing; that the burden of proof is upon the party seeking to establish the contract; and that specific performance is not a matter of right, but rests in the sound discretion of the court, to be determined from all facts and circumstances. *Jatcko* v. *Hoppe*, 7 Ill.2d 479; *Greenwood* v. *Commercial Nat. Bank of Peoria*, 7 Ill.2d 436; *Galapeaux* v. *Orviller*, 4 Ill.2d 442; *Wessel* v. *Eilenberger*, 2 Ill.2d 522; *Monninger* v. *Koob*, 405 Ill. 417; *Klussman* v. *Wessling*, 238 Ill. 568.

In the case at bar, the language used by the parties to express their understanding is not in dispute. The controversy centers around the interpretation of the instrument and the evidence of extrinsic matters which are claimed to have a bearing thereon. Stated simply, the agreement recites the dissolution of the partnership in 1949; the indebtedness resulting therefrom; and that Sharp had executed a will providing for the cancellation of the indebtedness. The only express promise contained therein is that of Martin B. Kennedy to purchase Sharp's interest in the commonly owned premises for $3,500.

If we consider the language alone, the consideration for Kennedy's promise is uncertain, and the instrument ambiguous. Defendant claims that, properly construed, it con-

tains two mutual and dependent promises: that Sharp will cancel the indebtedness by will, and that Kennedy will purchase property from his estate for $3,500. However, such construction would only give rise to further ambiguity in that it cannot be ascertained whether Sharp intended to cancel the past due notes or merely the notes due subsequent to his death. None of these notes were paid. We believe that the instrument is susceptible of other equally rational interpretations: first, that it was a simple bilateral contract to buy and sell; and second, that it was a unilateral promise to purchase, if Sharp cancelled the indebtedness by will.

While the instrument recites that Sharp had executed a will cancelling the indebtedness, a will is ambulatory and, in the absence of contract, may be revoked at the pleasure of the testator. (*Monninger* v. *Koob,* 405 Ill. 417; *Frese* v. *Meyer,* 392 Ill. 59.) A contract giving up the right of disposition must be clear and unambiguous, (*Sloniger* v. *Sloniger,* 161 Ill. 270,) and its terms clearly and convincingly established. (*Tess* v. *Radley,* 412 Ill. 405; *Chambers* v. *Appel,* 392 Ill. 294.) The instrument of January 21, 1952, contains no clear and unambiguous agreement by Sharp to cancel the indebtedness by will, and therefore cannot be enforced in this action.

In so construing this document, we have considered the testimony of the Kennedys' daughter and son-in-law relative to the statements allegedly made by the deceased. This testimony must be subject to closest scrutiny on several grounds. It consists of statements by interested persons as to what a person now deceased had said, (*Monninger* v. *Koob,* 405 Ill. 417; *Keshner* v. *Keshner,* 376 Ill. 354,) and the son-in-law was not only related to the defendant, but also was an attorney in this cause. (Cf. *Davis* v. *Brickey,* 397 Ill. 556, 563; *McKey* v. *McKean,* 384 Ill. 112, 122.) If we accept this testimony at face value, it does not aid us in construing the written document, nor does it amount

to clear and convincing proof of an agreement between the parties unambiguous in its terms. The most that can be adduced from this testimony is that both Kennedy and Sharp regarded each other with benevolence and had expressed an intention or desire that the survivor of them should care for the family of the other. Such expression did not constitute a binding contract to make a will. It was more in the nature of a hope or an unenforceable expectation based upon a mere statement of intention. Accordingly, we conclude that the record shows neither the cancellation of the notes, nor a contract to do so.

Defendant suggests that such a conclusion would result in a fraud upon the Kennedys. However, if any oral agreement existed between 1942 and 1946 which provided that the survivor of Kennedy or Sharp would care for the wife and family, if any, of the other, and that Kennedy would get the business when Sharp died, it was superseded by the written contract to dissolve the partnership, dated January 31, 1949, Sharp's contemporaneous sale of its assets to Kennedy, and the execution of the original notes. Thus, Sharp was the legal holder of these notes prior to the execution of the instrument dated January 21, 1952. If its total purpose was to furnish an annual income to Sharp and $3,500 for his funeral expenses, it failed in both respects, since neither Martin B. Kennedy nor Grace Kennedy either paid the notes or exercised the right to purchase under the instrument. In view of these facts we find no evidence of any fraud upon the Kennedys. The controversy here exists over the cancellation of the indebtedness evidenced by these notes. Their validity has never been questioned. Since defendant failed to establish a valid contract to make a will, neither Sharp nor his successors were under obligation to cancel the indebtedness.

We feel compelled to remind counsel of Rule 39(1)III of this court which provides that "The Statement of Facts shall contain the facts necessary to an understanding of

the case, without argument or comment, and with appropriate references to the abstract, \* \* \*." The court is not aided by a statement of facts which is replete with argument and conclusions and contains factual assertions without appropriate references to the abstract or record. We have relied upon the record in our determination that the trial court was correct in its findings and decrees. The decrees of the trial court are accordingly affirmed.

*Decrees affirmed.*