JEROME S. WALD, as Trustee of the Estate of Chicago Forwarding Company, *et al.*, Plaintiffs-Appellants, v. CHICAGO SHIPPERS ASSOCIATION *et al.*, Defendants-Appellees.

First District (3rd Division) No. 87—0748

Opinion filed October 12, 1988.

---

*Justice Stamos participated in the decision of this case prior to taking office as a supreme court judge.

Cherry & Flynn, of Chicago (Myron M. Cherry and Bruce Rose, of counsel), for appellants.

Schirott & Associates, P.C., of Des Plaines (Charles E. Hervas, of counsel), for appellants.

Mayer, Brown & Platt, of Chicago (Mark McLaughlin, of counsel), for appellee J. C. Penney Company, Inc.

Bell, Boyd & Lloyd of Oak Brook (James F. Hendricks, Jr., and Nancy E. Bertoglio, of counsel), for appellee Chicago Shippers Association.

Rooks, Pitts & Poust, of Chicago (D. Kevin Blair, of counsel), for appellees Rheem Manufacturing Company and Huffman Manufacturing Company.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiffs, Jerome S. Wald (Wald), as trustee of the estate of Chicago Forwarding Company (CFC), and Edcons, Inc., appeal the trial court's granting of a motion for summary judgment in favor of defendants, Chicago Shippers Association (CSA) and other companies who are current or former members of CSA. Plaintiffs sued defendants for breach of a contract pursuant to which plaintiffs agreed to perform pooling and consolidating services for defendants. In granting the motion for summary judgment, the trial court held that plaintiffs' claims are barred by the doctrines of waiver and estoppel; the specific contract provision at issue is too vague to be enforceable; and the individual defendants are not personally liable under the contract since they were not signatories to the contract.

For the reasons stated below, we affirm the judgment of the circuit court.

Plaintiffs' single-count amended complaint sounds in breach of contract and is drawn in 64 paragraphs. We will review the pertinent allegations in some detail. Since the allegations and arguments important to this appeal pertain mainly to plaintiff CFC, rather than plaintiffs Edcons and Wald, the term "plaintiff," appearing in the remainder of this opinion, refers to CFC, unless otherwise indicated. The complaint alleges that plaintiff provided transportation services for its customers and consolidated and forwarded its customers' freight. The function of plaintiff's consolidation services was "to take maximum advantage of the freight rate structure used by certain railroads." The railroads charged a flat fee for each 80,000-pound shipment. If the shipment weighed less than 80,000 pounds, the same flat fee was

charged nevertheless. Plaintiff worked to combine freight from various shipper/customers to form carload shipments, resulting in an apportionment of the total shipping price among the shippers who had freight in the carload. Thus, the complaint asserts, "[t]he greater the volume of freight supplied to plaintiff by its shipper/customers the greater were the number of potential combinations of freight available to plaintiff to make up the 80,000-pound carload shipments and the faster those shipments could be put together, moved out of Chicago and transported to their destination."

The complaint further alleges that defendant CSA is a not-for-profit corporation created to pool and consolidate merchandise for its members, including the individual defendants, at carload or other volume rates. Each member of CSA designates in writing a representative to act as its agent in CSA affairs. CSA's board of directors is elected from its members. CSA's officers are elected from the board of directors. Since the date of its incorporation, plaintiff handled only freight belonging to CSA members and was able to charge for its services only at those rates approved by CSA. Plaintiff was free to act as a freight consolidator for non-CSA members, but chose not to do so.

On March 12, 1975, at the request of CSA, CSA and its members entered into a written contract with plaintiff "which memorialized the previously existing, ongoing contractual relationship among CSA, its members, *** and CFC." The complaint alleges that CSA engaged the freight consolidating and forwarding services of plaintiff for years prior to the execution of the written contract. The purpose of the written contract allegedly was to insure for CSA the continuing availability and benefit of plaintiff's consolidating activities.

Further, the intention of the parties in executing the contract allegedly was that CSA's members would continue to provide freight to CSA at volumes at least equal to precontract levels. Paragraph 2(a) (the meaning of which is disputed in the instant appeal) allegedly provided that CSA and its members would route additional freight to plaintiff over and above the precontract amounts whenever possible. This agreement by CSA and its members, to use plaintiff to the fullest extent possible, allegedly constituted the major consideration for CFC's agreement to enter into the contract.

Defendants allegedly breached the contract by wrongfully diverting freight from plaintiff to other freight consolidators. CSA failed to ensure that its members, including the individual defendants, performed their obligations under the contract when they acted as members of CSA. Rather, the members shipped a portion of their freight

through plaintiff, thereby accepting the benefits of low rates accorded to CSA members under the contract, while they wrongfully diverted the remainder of their freight to other freight consolidators.

Further, CSA allegedly wrongfully imposed, over the objections of plaintiff, an additional charge on "runthrough" cars handled by plaintiff, the total amount of the charge being remitted to CSA. As a result of the additional charge being imposed, plaintiff's rates for handling "runthrough" cars became too high to be competitive in the freight consolidation industry. Thereafter, CSA members made additional wrongful diversions of freight from plaintiff.

The complaint asserts that as a result of the large and increasing volume of freight shipped through plaintiff by CSA members prior to the contract, the rates charged by plaintiff to CSA members always were much lower than rates charged to the general public by plaintiff's sister corporation (Chicago Furniture Forwarding Company). After execution of the contract, plaintiff continued to charge CSA a "much lower" rate than plaintiff's sister corporation (CFFC) charged the general public. For example, as of June 17, 1978, plaintiff charged CSA members 62 cents per hundredweight per line entry. As of the same date, CFFC charged the general public $2.95 per hundredweight for the same services.

Plaintiff alleges that from the date of execution of the contract, March 12, 1975, to May 1, 1981, it fully performed under the contract. Further, during that time, CSA members shipped freight to plaintiff for consolidation, thereby enjoying the benefits of the contract. Some time after the execution of the contract, on dates unknown or unspecified by plaintiffs in the complaint, CSA and certain of its members began to breach their obligations under the contract, including paragraph 2(a), by wrongfully diverting freight from plaintiff to various freight terminals owned and/or operated on behalf of individual CSA members and various other transportation agents.

As a result of the financial losses suffered by plaintiff in consequence of the repeated breaches by CSA and its members, plaintiff filed on December 22, 1980, a voluntary petition for reorganization. Plaintiff continued to operate the business as a debtor in possession until May 1, 1981, when the cause was transferred to a chapter 7 liquidation and Wald was appointed as trustee.

The parties presented the following deposition testimony. Norcross Putnam, executive secretary of CSA, stated in his deposition that CSA would contract with a consolidator by first asking CSA members how much freight they could ship to a particular location during a given time period. Putnam then negotiated with consolida-

tors for charges to CSA members for the consolidators' services at rates lower than the consolidator was charging the general public. After agreement was reached on the rates, the agreement was memorialized in a "memorandum of understanding." These memoranda of understanding were form contracts drafted by defendants. The names and addresses of the consolidators and the agreed-upon rates were filled in by the parties to the agreement. Each CSA member received copies of the memoranda executed. Thereafter, the consolidator's rates for CSA members could not be changed without the approval of CSA's board of directors.

Contrary to defendants' usual procedure for establishing a pooling operation, plaintiff's relationship with CSA was not immediately memorialized in a memorandum of understanding. However, the relationship operated in a manner similar to that of defendants' relationships with other consolidators. Plaintiff eventually became one of CSA's top three pool car operations in terms of volume of freight handled. In 1974, CSA sent a new form contract to all 22 consolidators and distributors with whom defendants had established pooling operations.

The form contract contained the following language in paragraph 15:

> "15. CSA agrees to utilize Assembler's [consolidator's] services under this agreement, in routing all normal shipments of merchandise from CSA's members [sic] sources in the Chicago, Illinois area when it is practical and economical for CSA members to do so."

E. C. Snyder, former president of CFC, stated in his deposition that after plaintiffs received the form contract, CFC's Snyder told defendants that he did not believe that a contract was necessary. Snyder stated that if there must be a written contract, plaintiff wanted the contract to state that the Santa Fe Railway was providing the labor for CFC's operations and would be liable for any freight losses. Snyder stated in his deposition that paragraph 2(a) of the new contract was intended to impose on defendants the same obligation that they had imposed on themselves in paragraph 15 of the form contract. That obligation, according to Snyder, was to route their freight through CFC for pooling and consolidation whenever it was practical and economical to do so.

Paragraph 2(a) of the new contract provides:

> "2. CSA and its members agree as follow [sic]:
> (a) They shall assist in obtaining the largest possible volume of acceptable freight for this consolidation and will utilize these facilities to the fullest extent for the shipment of their goods."

Snyder stated that the new contract was drafted by Snyder and Putnam and copies were sent to the CSA board, president, and members. A meeting was held on February 24 and 25, 1975, during which, in the presence of Putnam and Snyder, the contract was discussed and agreed to by CSA's board. Paragraph 2(a) was specifically discussed and agreed to by the CSA board. The contract was returned to Snyder for his signature on behalf of plaintiffs. Snyder made some minor changes, including a provision for arbitration, and returned the contract to Putnam. Putnam stated that the contract was then presented to CSA's president and chairman and was executed by CSA, and copies were sent to CSA members.

Snyder further stated that defendants began wrongfully diverting freight to other consolidators between 1975 and 1979. For example, in 1977, defendant Woolworth opened its own freight consolidation facility for shipments to Minneapolis, Kansas City, and Omaha. As a result of the diversion of Woolworth's freight, CFC had too little freight going to those cities to make it practical for CFC to continue consolidating any freight to those locations. Further, in July 1975, Snyder stated, CSA itself imposed a 35-cent surcharge for every hundred pounds of freight contained in CFC-handled runthrough cars. As a result of the surcharge, CFC's overall charges for runthrough cars (although not its underlying rates), plaintiffs assert, substantially exceeded those of its competitors. Consequently, CFC lost a significant portion of its runthrough car business, according to Snyder.

Snyder also stated that he repeatedly told CSA and its board members, privately and at board meetings, in addition to individual members of CSA, that: (1) the volume of freight CFC was receiving from CSA's members was declining; (2) the freight was being diverted to other consolidators; and (3) all such diversions violated the contract. As of January 1, 1979, the Santa Fe Railway stopped providing labor for CSA's consolidating activities. A Santa Fe officer told Snyder that the railroad charged CFC rates far below the railroad's costs and that the railroad was losing money on the service provided. Plaintiffs thereafter replaced Santa Fe's labor with labor supplied by an independent contractor. As a result, CFC's labor costs rose. CSA, however, refused to grant CFC a rate increase.

On appeal plaintiffs contend that the trial court erred in holding that: (1) paragraph 2(a) of the contract is too indefinite to be enforceable; (2) plaintiffs waived, and were estopped from asserting, their claims against defendants; and (3) the individual members of CSA were not bound by the contract.

Defendants respond that summary judgment was properly

granted based on the following: the contract does not state that CSA would use CFC exclusively for consolidation of freight in the Chicago area; the agreement fails to specify any levels of shipment to be shipped under the contract; the agreement provides for termination by either party on 30 days' notice; the agreement was signed by plaintiff and CSA but not by the individual members of CSA; the agreement provided that all physical labor would be provided by the Santa Fe Railway and that Santa Fe would be responsible for all loss or damages and errors; and plaintiffs were aware that tonnage shipped through CFC's facilities by CSA began declining in 1970 and that the alleged breaches by defendants occurred in 1975, but plaintiffs nevertheless continued performance thereafter.

Defendants also assert that the statement of facts in plaintiffs' appellate brief violates Supreme Court Rule 341(e) (107 Ill. 2d R. 341(e)). For instance, plaintiffs state as a fact that the agreement between the parties is a "requirements" contract and an "exclusive" contract. Further, plaintiffs set forth inaccurate summaries of deposition testimony.

Supreme Court Rule 341(e)(6) provides in part that the statement of facts section of an appellate brief shall set forth facts "accurately and fairly without argument or comment." (107 Ill. 2d R. 341(e)(6).) We find that plaintiffs' statement of facts contains improper argument and mischaracterizes deposition testimony, all in violation of Supreme Court Rule 341(e)(6). For instance, when reviewing the deposition testimony of Norcross Putnam, one of CSA's officers, plaintiffs erroneously provide that Putnam stated that "CFC, just like any other consolidator with an exclusive contract with defendants, had no recourse against defendants when it did not receive the agreed-upon volume of freight from defendants." The pages cited to support plaintiffs' summary of the deposition testimony do not support plaintiffs' argumentative and conclusory presentation in the statement of facts. Further, plaintiffs assert in their statement of facts that the omission of a reference to railroads in the form contract "evidences defendant's [sic] lack of concern about who was providing the labor for the consolidator's and distributor's activities." Such a statement is clearly conclusory and therefore was improperly included in plaintiffs' statement of facts. In addition, plaintiffs state that under the terms of the form contract, defendants would be able to "maintain control over the consolidators and distributors while preventing them from terminating the contract for any breach by defendants of Paragraph 15." Again, this statement is conclusory and argumentative, and improper in the statement of facts section of plaintiffs' brief.

■ While we point out these violations, we find that the violations are not so flagrant as to hinder or preclude review of plaintiffs' cause on appeal. (See *Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 396-97, 515 N.E.2d 1047.) We have relied upon the record in making a determination regarding the correctness of the trial court's findings and decision. (See *Harper v. Kennedy* (1958), 15 Ill. 2d 46, 55, 153 N.E.2d 801.) Therefore, we address the merits of plaintiffs' appeal.

Plaintiffs initially assert that the trial court erred in ruling that paragraph 2(a) of the contract is too indefinite to be enforceable. Plaintiffs contend that defendants mischaracterized to the trial court the holding in *Kraftco Corp. v. Kolbus* (1971), 1 Ill. App. 3d 635, 274 N.E.2d 153, and cited *dicta* in *Kolbus* regarding the issue of mutuality of obligation under a contract. Plaintiffs contend that *Kolbus* is inapposite to the instant case, since mutuality of obligation is not at issue here, but rather the issue of definiteness of contract language.

In *Kolbus*, the defendant-counterclaimant was a distributor of the products of the plaintiff-counterdefendant, a manufacturer. The trial court entered judgment on the plaintiff's complaint for the defendant's failure to pay the plaintiff for certain items purchased. The trial court also dismissed the counterclaim. On appeal, the defendant asserted that its counterclaim should not have been dismissed and that the plaintiff had made a binding oral agreement with the defendant to allow the defendant to purchase a distributorship and to assist him in any future sale of the distributorship he might wish to make. The defendant in turn agreed to use his best efforts to sell the products.

The parties raised the issue of mutuality of obligation. In determining that the parties' contract lacked mutuality of obligation and was unenforceable, the court considered, among other things, that the obligation of the defendant to use his "best efforts" to sell the products was too indefinite and uncertain to be an enforceable standard. (*Kolbus*, 1 Ill. App. 3d at 639.) *Kolbus* cites *Goodman v. Motor Products Corp.* (1956), 9 Ill. App. 2d 57, 132 N.E.2d 356, which involved a contract containing terms similar to the contract in *Kolbus*, including the "best efforts" language. The contract in *Goodman*, however, provided for termination only by the defendant. The *Goodman* court held that "[u]nder the doctrine of mutuality, such a contract in so far as it was executory, could be terminated by defendant by due notice at any time as to all or any part of [defendant's] assigned territory." (*Goodman*, 9 Ill. App. 2d at 68.) The *Goodman* court further found that the term "best efforts" was too vague to be fairly intelligible and too lacking in certainty to be enforceable. (*Goodman*, 9 Ill. App. 2d at 70-

72.) Thus, both *Goodman* and *Kolbus* looked to the "best efforts" language of the contract involved in order to determine the issue of mutuality.

*Kolbus*, however, also contains a discussion of the issue of definiteness of terms. The court found that where there is no obligation regarding duration, prices, area, products, quotas, and quantity set forth in the contract, the contract lacks the requisite certainty to be enforceable. (*Kolbus*, 1 Ill. App. 3d at 638-39.) The *Kolbus* analysis regarding definiteness of contract terms is pertinent to the instant appeal.

Paragraph 2(a) contains the only terms of the contract regarding CSA's obligation concerning volume of freight and the extent to which CSA agrees to utilize CFC's services. Paragraph 2(a), however, fails to set forth specific terms regarding the efforts to be made by CSA in utilizing CFC's services, such as the duration of the contract, or a specific quantity of freight to be shipped, in terms of actual volume or the percentage of CSA's total freight. The absence of such terms supports a conclusion that the paragraph is too indefinite to be enforceable. *Kolbus*, 1 Ill. App. 3d at 638-39.

The trial court found that paragraph 2(a) is "too vague" to be enforceable. Whether a contract is ambiguous is a question of law for the court. (*Midland Hotel Corp. v. Reuben H. Donnelley Corp.* (1986), 149 Ill. App. 3d 53, 501 N.E.2d 1280, *aff'd in part, rev'd in part on other grounds* (1987), 118 Ill. 2d 306, 515 N.E.2d 61.) A contract is ambiguous when the language used is susceptible to more than one meaning (*Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937, 445 N.E.2d 901) or is obscure in meaning through indefiniteness of expression (*Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 414 N.E.2d 1152). The primary object in construing a contract is to give effect to the intention of the parties. *Midland Hotel Corp.*, 149 Ill. App. 3d at 62.

We find that paragraph 2(a) is ambiguous as a matter of law. Its terms are obscure and indefinite in meaning. (*Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 414 N.E.2d 1152.) Paragraph 2(a) fails to specify quantity or volume of freight, duration of the contract or applicable time periods, price, or other terms to define clearly CSA's obligations under the contract. The language that CSA "shall assist in obtaining the largest possible volume of acceptable freight for this consolidation" is not obvious or definite in its meaning.

Plaintiffs also assert that defendants violated the contract by imposing a surcharge on runthrough cars. Plaintiffs fails to point to a

specific provision in the contract which was violated by defendants' alleged conduct, nor does our review of the contract indicate any specific violation. Paragraph 1(h) sets forth terms regarding handling and loading charges that plaintiff will charge under the contract. Paragraph 2, which sets forth the obligations of CSA, is silent regarding any charges being made by CSA under any circumstances. In the absence of any specific contract language being violated, or other clear evidence indicating that the defendants may have breached the agreement, we find that plaintiffs' argument fails to create a triable issue which would defeat the motion for summary judgment. See *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.

■ Plaintiffs also contend that paragraph 2(a) is enforceable as a "requirements" provision. A requirements contract involves a promise to buy from another all of some commodity or service that the promisor may thereafter need or require in his business, usually for a designated period of time. (*Illinois Commerce Comm'n v. Central Illinois Public Service Co.* (1975), 25 Ill. App. 3d 79, 322 N.E.2d 520, citing 1A A. Corbin, Contracts §156, at 30-32 (1963); see also *Hall v. Gruesen* (1959), 22 Ill. App. 2d 465, 161 N.E.2d 345.) Requirements contracts generally provide that the products or services will be provided in an amount to equal all that the purchaser "will need" or "will require" in his business, usually over a certain period of time. (See *Illinois Commerce Comm'n*, 25 Ill. App. 3d at 82.) The language of paragraph 2(a) in the instant case does not provide for "all" of the pooling and consolidating services that CSA "will need" or "will require." Further, the evidence clearly shows that plaintiffs were members of only one of several companies that provided consolidation services to defendants. Paragraph 2(a) therefore fails to constitute a "requirements" contract provision.

Plaintiffs also assert that even if the trial court was correct in finding paragraph 2(a) ambiguous, the court erred in failing fully to consider extrinsic evidence. Plaintiffs assert that the contract was executed as a result of defendants' insistence on a written agreement. Further, extensive negotiations of the contract terms were conducted prior to the signing of the contract.

■ Where there is an ambiguity arising from the terms of a contract, the meaning may be derived from extrinsic facts surrounding formation. (*Mid-City Industrial Supply Co. v. Horwitz* (1985), 132 Ill. App. 3d 476, 476 N.E.2d 1271.) A contract is sufficiently definite and certain if the court is able, from its terms and provisions and allowable extrinsic evidence, to ascertain what the parties agreed to. (*Mid-*

*land Hotel Corp. v. Reuben H. Donnelley Corp.* (1986), 149 Ill. App. 3d 53, 501 N.E.2d 1280, *aff'd in part and rev'd in part on other grounds* (1987), 118 Ill. 2d 306, 515 N.E.2d 61.) Where extrinsic evidence is introduced to aid in the interpretation of uncertain or ambiguous contract language, the question of the meaning of the language generally is left to the jury. If, however, after taking into account the extrinsic evidence, the court determines that a reasonable person could reach only one conclusion, then the issue should be decided by the trial court. *Dwyer v. Graham* (1982), 110 Ill. App. 3d 316, 442 N.E.2d 298, *rev'd on other grounds* (1983), 99 Ill. 2d 205, 457 N.E.2d 1239.

Plaintiffs presented extrinsic evidence to indicate that the parties intended that paragraph 15 from the prior form contract "become" paragraph 2(a). Paragraph 15 required CSA to "rout[e] all normal shipments of merchandise from CSA's members [*sic*] sources in the Chicago, Illinois area when it is practical and economical to do so." E. C. Snyder stated in his deposition that he and Putnam looked to the form contract, including paragraph 15, when they negotiated the terms of their new contract. Snyder stated that paragraph 2(a), like paragraph 15 of the form contract, required defendants to use CFC's services at all times when it is "practical and economical to do so."

■ The extrinsic evidence, however, does not make clear the intentions of the parties regarding the meaning of paragraph 2(a). Snyder indicated to defendants that plaintiffs did not agree to be bound by the form contract. Further, CSA's Norcross Putnam failed to indicate in his deposition that defendants intended that paragraph 2(a) require them to use CFC whenever it was practical and economical, as was required by paragraph 15 of the form contract. Putnam stated that the language "acceptable freight" in paragraph 2(a) meant merely that type of freight shipped through CFC prior to the contract. The extrinsic evidence thus fails to provide definiteness of meaning to the ambiguous language of paragraph 2(a).

Plaintiffs also contend that the prior course of dealing and part performance by defendants and CFC establishes an enforceable contract and removes any uncertainty from paragraph 2(a). Plaintiffs assert that the contract provides for a continuation of the prior business relationship that existed between the parties for 24 years before the contract was signed. The parties understood that the contract is "cooperative" in nature, in that the more CSA members who ship freight through plaintiff, and the more freight they ship, the better rates and service they and their fellow CSA members will receive. Defendants took advantage of the benefits of the contract after its execution.

■ A previous course of dealing may give meaning to or qualify an agreement. (*Carrico v. Delp* (1986), 141 Ill. App. 3d 684, 490 N.E.2d 972, citing Restatement (Second) of Contracts §223, at 157-60 (1981).) Part performance of an agreement may also remove uncertainty and establish an enforceable contract. (*Yoder v. Rock Island Bank* (1977), 47 Ill. App. 3d 486, 362 N.E.2d 68.) Further, where the terms of a contract are doubtful or uncertain and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the courts. (*Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 81, 195 N.E.2d 137; *Kroll v. Sugar Supply Corp.* (1983), 116 Ill. App. 3d 969, 452 N.E.2d 649.) A contract, however, will not be held binding and enforceable unless its terms are sufficiently definite and certain. *Wilson v. Illinois Benedictine College* (1983), 112 Ill. App. 3d 932, 937, 445 N.E.2d 901.

■ Plaintiff presented evidence that the parties engaged in the business of shipping and consolidating freight for approximately 24 years prior to the execution of the written contract, and therefore, they had an understanding with defendants regarding how and under what terms the consolidation and pooling work would be conducted. However, there was also evidence to indicate that the amount of freight defendants were shipping through CFC was declining even in the three to five years prior to execution of the .contract. That is, there was no clear indication to show that the parties' conduct or prior dealings established the specific terms of the obligation referenced in the contract. In fact, those terms seemed to vary over the years. Plaintiffs state in their appellate brief that the contract "was performed in varying degrees over a five and a half year period." The trial court stated that there appeared to be some obligation between the parties regarding the pooling and shipping of freight. However, the obligations are not defined by either the contract itself or the conduct of the parties in a manner definite and certain enough for the court to enforce. Therefore, we agree with the trial court's conclusion.

Plaintiffs also assert that the trial court erred in ruling that plaintiffs waived and were estopped from asserting their claims against defendants. Plaintiffs contend that Snyder repeatedly tried to enforce plaintiffs' rights "in every manner short of actually bringing suit against the defendants." CFC failed to take more harsh action so that it would not lose all of its business from CSA. In any event, plaintiffs allege, the question of intent to waive is a question of fact to be decided by a jury rather than the court on a motion for summary judgment.

■■ ■ Waiver, the intentional relinquishment of a known right, can arise either expressly or by conduct inconsistent with an intent to enforce the right. (*Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 372, 335 N.E.2d 491, 496; *Phillips v. Elrod* (1985), 135 Ill. App. 3d 70, 74, 478 N.E.2d 1078, 1082.) Where there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute waiver. However, if the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to inferences to be drawn from undisputed evidence, then the issue becomes a question of fact. (*Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 335 N.E.2d 491; *Dwelling House Insurance Co. v. Dowdall* (1895), 159 Ill. 179, 42 N.E. 606.) We believe that the trial court in the instant case properly determined the issue of waiver as a matter of law. The evidence regarding the parties' conduct during the relevant period is undisputed. Further, we do not believe that there is more than one reasonable inference to be drawn from the undisputed evidence.

Analysis of the applicability of waiver focuses on the intent of the nonbreaching party. (*Saverslak v. Davis-Cleaver Produce Co.* (7th Cir. 1979), 606 F.2d 208, 213, *cert. denied* (1980), 444 U.S. 1078, 62 L. Ed. 2d 762, 100 S. Ct. 1029.) The allegedly nonbreaching party in the instant case is plaintiff. CFC's Snyder stated in his deposition that he verbally informed Woolworth and other CSA members beginning in 1975 and continuing thereafter that they were in violation of the contract. Snyder was aware since 1975, immediately or almost immediately after execution of the contract on March 12, 1975, that defendants were in breach of the contract. Snyder was aware of his alleged rights under the contract. His failure to take action, other than verbally informing defendants of their alleged breaches, is inconsistent with an intent by him to enforce his rights. Therefore, we will not disturb the trial court's decision that plaintiffs waived their rights under the contract by knowingly failing to enforce them.

Regarding estoppel, plaintiffs assert that the trial court failed to consider the conduct of defendants. Plaintiffs assert that their forbearance in bringing suit was involuntary, as it was occasioned by "defendants' power arbitrarily to destroy CFC by terminating the contract and refusing to ship freight through CFC." Defendants could not have relied in good faith on plaintiffs' reluctance to file suit, plaintiffs assert, since Snyder repeatedly told defendants that the contract was being breached. Further, defendants failed to show that they changed their position in any way from the execution of the contract to the filing of plaintiffs' suit. Plaintiffs also assert that the contract

was never terminated, as defendants continued to use CFC's services.

■■ Equitable estoppel arises through a party's voluntary conduct whereby he is precluded from asserting his rights against another who in good faith relied on such conduct and was therefore led to change his position to his detriment. (*Phillips v. Elrod* (1985), 135 Ill. App. 3d 70, 74, 478 N.E.2d 1078, 1082.) Unlike waiver, estoppel focuses not on the obligor's intent, but rather on the effects of his conduct on the obligee. (*Saverslak v. Davis-Cleaver Produce Co.* (7th Cir. 1979), 606 F.2d 208, 213, *cert. denied* (1980), 444 U.S. 1078, 62 L. Ed. 2d 762, 100 S. Ct. 1029.) In order to prevail on the theory of estoppel, a party must show by "clear and unequivocal" proof (*Easterday v. Marchman* (1962), 36 Ill. App. 2d 321, 183 N.E.2d 182) that he relied on some acts or representation of the other party and had no knowledge or convenient means of knowing the true facts (*Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 372, 335 N.E.2d 491, 495).

■■ We find that defendants presented sufficient proof to show that they relied to their detriment on the inaction of plaintiffs to enforce their alleged rights under the contract so as to constitute estoppel. Therefore, we will not disturb the trial court's decision regarding this issue. (See *Finley v. Finley* (1980), 81 Ill. 2d 317, 410 N.E.2d 12.) Defendants were aware that even after Snyder told them that alleged breaches were occurring, he failed to enforce his rights under the contract and allowed defendants to continue to ship freight in lesser volumes than in the past. As a result of plaintiffs' inaction, defendants themselves failed to terminate the contract.

Defendants assert that the doctrine of *laches* also applies to defeat plaintiffs' claim. The trial court declined to rule on the issue of *laches*, and we need not address this argument on appeal.

Finally, plaintiffs contend that the trial court's holding that the individual CSA members were not bound by the contract was erroneous. Plaintiffs argue that the CSA organization was created specifically to enter into such contracts on behalf of the members. CSA, plaintiffs assert, was acting as the agent of the individual members with full authority to enter into the contract. Further, the individual CSA members ratified the contract, since they had full knowledge of the terms of the contract and took advantage of the benefits of the contract. Therefore, the individual members are bound by the contract.

With regard to this issue, the trial court stated:

"Obviously the parties to this contract are Chicago Shippers Association and Chicago Forwarding Association. It's true that

the defendant, as I read the contract, entered into it, meaning Chicago Shippers, for the benefit of certain member companies. They were not, it appears to me, personally liable under this contract in that they were not signatures [*sic*] to it."

 We agree with defendants that this issue was not fully briefed and argued by the parties in the trial court. The facts pertinent to the role, if any, of the individual defendants in executing or becoming personally liable under the contract are not fully set forth. We believe that the trial court's statements regarding this matter constitute *dicta*. Such general expressions in a court's opinion which go beyond what is necessary to decide a case are entitled to respect; however, such expressions are not binding in a subsequent suit. (*Board of Trustees of the Police Pension Fund v. Illinois Human Rights Comm'n* (1986), 141 Ill. App. 3d 447, 490 N.E.2d 232.) Even assuming that the trial court's comments do not constitute *dicta*, the language of CSA's bylaws, in article II, section 4, that "neither shall the members incur any liability for the debts or obligations of this Corporation by reason of such membership," indicates that the members would not be held personally liable under the contract, if the contract was enforceable.

 Summary judgment will be granted only if the pleadings, affidavits, and depositions on file reveal that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005; *Murphy v. Urso* (1981), 88 Ill. 2d 444, 463-64, 430 N.E.2d 1079.) If there are no facts in dispute, inferences may be drawn from the undisputed facts to determine if the party is entitled to judgment as a matter of law. If no fair-minded person could draw different inferences from these facts, then there is no triable issue and the motion for summary judgment should be granted. (*Ding v. Kraemer* (1978), 59 Ill. App. 3d 1042, 376 N.E.2d 266.) For the reasons discussed above, we believe that defendants in the instant case were entitled to summary judgment as a matter of law and that the trial court therefore acted properly in entering judgment in favor of defendants.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

WHITE, P.J., and RIZZI, J., concur.