TOTAL CONTROL, INC., Plaintiff,

v.

DANAHER CORPORATION,
et al.  Defendants,

No. 02–CV–668.

United States District Court,
E.D. Pennsylvania.

July 1, 2004.

Mitchell A. Kramer, Kramer & Kramer, LLP, Rydal, PA, for Plaintiff.

Herbert I. Rothbart, Chicago, IL, Michael J. Torchia, Semanoff, Ormsby, Greenberg & Torchia LLC, Jenkintown, PA, for Defendants.

## EXPLANATION AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Total Control, Inc. ("Total Control") promotes and sells products for the manufacturers it represents. Defendant is a group of interlocking corporations that plaintiff collectively refers to as Danaher Corporation ("Danaher")[1] that manufactures digital equipment and controls as well as other products. Total Control formerly represented some product lines for Danaher, but their relationship terminated on December 31, 2001.

On January 31, 2003, plaintiff filed a four count amended Complaint alleging violations of state law.[2] Only two counts remain: Count I, a claim for Breach of Contract, and Count III, a claim for Violation of the Pennsylvania Commissioned Sales Representative Law (PCSRL).[3] In Count I, Total Control argues that Danaher's breach of contract resulted in at least six categories of products for which it was not paid commissions or not paid the full commissions to which it was entitled: 1)

---

1. Danaher explains that the proper defendants are Dynapar Corporation, an Illinois corporation, and Danaher Controls Corp., a North Carolina corporation, doing business as part of, in certain instances, Danaher Industrial Controls Group. This is not a contested issue.

2. This Court has jurisdiction based on diversity.

3. On April 28, 2004, plaintiff elected not to pursue Count II, a claim for Tortious Interference with Business Relations, and Count IV, a claim for Unjust Enrichment.

commissions earned, but not paid, for sales made as of December 31, 2001, the effective date of termination; 2) commissions due on products sold into Total Control's territory for which they customarily received commissions, but which were not paid; 3) commissions earned from the effective date of termination, until the end of the 120–day notice period;[4] 4) commissions earned on products converted from the "I"mmature category to the "M"ature category; 5) commissions on Veeder–Root products #s 7303, 7305, 7443, 7444, 7445, 7456, and 9930, and 6) commissions on Veeder–Root vote counting machines, Veeder–Root MINGRP 2030, and Veeder–Root 8010 (same as 2030, but was renumbered in 2001). Danaher disputes that it breached the Agreement and also argues that it was discharged from its obligations under the Agreement because of Total Control's non-performance.[5]

On April 20, 2004, Defendant Danaher filed a motion for summary judgment. Oral arguments on the motion for summary judgment were held on June 18, 2004. For the reasons that follow, I grant Danaher's motions for summary judgment only with respect to two discrete issues in Count I: 1) Total Control is entitled to commissions on (a) digital equipment and controls and (b) products merged into the Dynapar product line that were sold by the Veeder Root Digital Product Group in 1991, and 2) Total Control is not entitled to commissions sought on products converted from the "I"mmature to the "M"ature categories. Because there are outstanding questions of material fact that apply to

each, I deny defendant's motion for summary judgment with respect to the balance of the commissions claimed in Count I,[6] including Danaher's defense of non-performance on the part of Total Control, and with respect to Count III, the claim under the Pennsylvania Commissioned Sales Representative Act.

## I.  Facts

On June 30, 1986, Total Control entered into an Agency Agreement (the "Agreement") with Dynapar, an Illinois Corporation. (Pl. Mem. Opp'n D's Mot. Summ. J. Ex. 3.) Dynapar drafted the Agreement. (*Id.* Ex. 2 at ¶ 4.) Dynapar manufactures digital equipment and controls and other products.

The introductory paragraph to the Agreement states:

> Whereas, Dynapar is a manufacturer of digital equipment and controls and desires to provide for the sale of its products in the States of Eastern Pennsylvania, Maryland, Delaware, Southern New Jersey and the District of Columbia.

> Whereas, the Agent [Total Control] desires a right to sell Dynapar's digital equipment and controls in the States of Eastern Pennsylvania, Maryland, Delaware, Southern New Jersey, and the District of Columbia.

(*Id.* Ex. 3.)

Section 1  of the Agreement states:

> Dynapar hereby appoints Agent [Total Control] as a sales agent of all Dynapar

---

**4.**  It was established on the record in the oral arguments that plaintiff seeks commissions earned but not paid for 90 days after the date of termination, not 120 days as stated in the plaintiff's memorandum opposing defendant's motion for summary judgment.

**5.**  Danaher alleges that Total Control promoted products for other companies which competed against Danaher in violation of the Agreement.

**6.**  The claim for commissions earned, but not paid, for sales made as of December 31, 2001, was resolved on the record at the June 18, 2004 hearing.

name brand digital equipment and controls (hereinafter sometimes referred to as "Products") . . .

(*Id.*)

Section 1.A.2. of the Agreement states: Dynapar reserves the right to handle directly any account in the agent's assigned territory.

(*Id.*)

Section 7 of the Agreement states: Dynapar agrees to pay the AGENT [Total Control] fifty percent (50%) of the applicable commission rate on or about the fifteenth (15th) day of the month following the month in which the shipment is made.

(*Id.*)

Section 8 of the Agreement states in relevant part:

The AGENT [Total Control] agrees that it will not sell or promote the sale of any line of products, either directly or indirectly, which compete in any way with Dynapar's products, without the express written approval of Dynapar, nor will the AGENT [Total Control] enter into any agreement for the pooling and dividing of commissions with competitors or the agents or representatives thereof.

(*Id.*)

Section 11 of the Agreement states:

The term of this Agreement shall be twelve (12) month from the date hereof, provided, however, that either party shall have the option of cancelling this Agreement without cause upon thirty (30) days' advance written notice. If this Agreement is not cancelled by notice of either party, or for any other reason, before the expiration of the agreed period herein, the Agreement shall automatically renew itself from year to year, provided, however, that either party shall have the option at any time, of cancelling this Agreement without cause upon one (1) months' (sic) advance notice during any renewal period.

(*Id.*)

Section 13 of the Agreement in relevant part states:

The validity, effect, and construction of this Agreement shall be governed by the laws of the state of Illinois, except insofar as the laws of the United States of America are clearly applicable hereto.

(*Id.*)

On December 13, 1988, the Marketing Manager of Dynapar sent the President of Total Control a letter which stated in relevant part:

For 1989, we are extending the normal 30 day cancellation period from 30 days to 120 days. Furthermore, this 120 day provision shall remain a condition of your contract in subsequent years, conditional to your sales increasing by 10 percent over prior year sales. Should this not occur, then the contract would revert to normal 30 day terms.[7]

(*Id.* Ex. 3 at 12.)

On February 21, 1991, another letter was sent to the President of Total Control. The letter was written on Dynapar Corporation letterhead. The letter was signed by an individual whose title was "Vice

---

**7.** Relating to the December 13, 1988 amendment, during the 2000 calendar year, Danaher maintains that it paid Total Control certain commissions on sales in its territory that it characterizes as "gifted" sales. Danaher defines "gifted sales" as sales paid without any consideration on the part of Total Control. (D. Mot. Summ. J. Ex. J ¶ 32.) The dollar amount of the sales in Total Control's territory increased by more than 10 percent in 2000 over the dollar amount of the sales in Total Control's territory in 1999. (Pl. Mem. Opp'n D's Mot. Summ. J. Ex. 5 at p. 53–54.)

President Sales." The letter stated in relevant part:

> This letter shall serve as an addendum to our existing Representative contract [unintelligible] your company.
>
> 1. Effective April 1, 1991, your territory shall be amended to not include any part of the state of New Jersey. You will, however, receive commissions on any orders entered by March 31, 1991 for that territory.
>
> 2. All other geography of your territory shall remain the same.
>
> 3. Effective April 1, 1991, all products currently sold by the Veeder–Ro [rest unintelligible] Digital Products Group which shall be merged with the Dynapar product line, shall be included as part of this Representative Agreement.
>
> 4. All other terms and conditions of the original agreement and subsequent addendum shall remain the same.

(*Id.* Ex. 3 at 14.)

On November 12, 1993, another letter was sent to the President of Total Control. The letter was written on Dynapar Corporation and Veeder–Root Company letterhead. Below both companies' names were the words "Partners in Control." This letter was signed by an individual whose title was "Vice President, Sales Danaher Controls." The letter stated in relevant part:

> This letter and the contents therein will serve as an amendment to the current contract between Total Control and

**8.** According to Danaher, new products—so-called "I"mmature products-require the education of customers, and generally are more difficult to sell. Consequently, the commission rate paid to Total Control was higher than the so called "M"ature products that have selling momentum, a replacement market, and enjoy customer familiarity. Because Total Control does not have to work as hard

Danaher Controls for representation in the prescribed territory.

> Effective January 1, 1993, Total Control will commence representation of the Eagle Signal Products which have become part of the Danaher Controls Product line.
>
> Effective on or about January 1, 1994, Danaher Controls shall begin designation of product classes as offered through its Distributor sales organizations into "M"ature and "I"mmature. This product designation shall be for all products including Eagle products sold through distribution.
>
> Effective January 1st, 1994, those products designated as "M"ature shall be subject to a commission rate of 3% and those designated as "I"mature shall be subject to a commission rate of 10%. This amendment shall effect only those items specifically discussed above and shall not effect any other terms or conditions of the existing contract.

(*Id.* Ex. 3 at p. 15.)

After 1994, Danaher continued to designate products as "M"ature and "I"mmature and pay different commissions for different products.[8]

On November 28, 2001, another letter was sent to the President of Total Control. The letter was written on letterhead listing the names of a number of companies, including Danaher Controls.[9] The letter was signed by an individual whose title was "Vice President Sales." The letter stated in relevant part:

> to sell "M"ature products, the commission Total Control would earn for the sale of those products is lower. (D. Mot. Summ. J. Ex. I ¶ 21.)

**9.** Below the name Danaher Controls were a number of names, including Veeder Root and Dynapar.

Due to the challenges facing our business, we are restructuring our [unintelligible] channel. Unfortunately, this action will result in the termination of your company's sales agent agreement with Danaher Controls.

This letter serves as a 30–day prior written notice of cancellation of your appointment as a Sales Agent of Danaher Controls. The effective date of this cancellation is December 31, 2001.

(*Id.* Ex. 4)

Total Control promoted products for companies other than Danaher. (D. Mot. Summ. J. Ex. J at ¶ 26–27.)

## II. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must determine "whether the evidence presents a sufficient [factual] disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The issue before me involves the parties' obligations under a contract. When the summary judgment motion pertains to contract interpretation, I must first decide whether the terms of the contract are clear or ambiguous. A court " 'must determine that the contract is so clear that it can be read only one way.' If the opposing party asserts a reasonable reading differing from that of the district court, then the meaning of the contract must be resolved at trial." *Schoch v. First*

*Fidelity Bancorporation,* 912 F.2d 654, 656 (3d Cir.1990) (*quoting Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987)).

## III. Undisputed Issues of Fact

### A. Products that are not Digital Equipment and Controls

Total Control claims that it is entitled to commissions on all items that Dynapar makes. Total Control argues that the February 21, 1991 amendment appoints Total Control to represent all Danaher products regardless of whether they were digital or not.

This breach of contract claim, as well as those not addressed in this Explanation, requires interpretation of the Agreement.

The introductory paragraph to the Agreement states:

Whereas, Dynapar is a manufacturer of digital equipment and controls and desires to provide for the sale of its products in the States of Eastern Pennsylvania, Maryland, Delaware, Southern New Jersey and the District of Columbia.

Whereas, the Agent [Total Control] desires a right to sell Dynapar's digital equipment and controls in the States of Eastern Pennsylvania, Maryland, Delaware, Southern New Jersey, and the District of Columbia.

(Pl. Mem. Opp'n D's Mot. Summ. J. Ex. 3.)

Section 1 of the Agreement states:

Dynapar hereby appoints Agent [Total Control] as a sales agent of all Dynapar name brand digital equipment and controls (hereinafter sometimes referred to as "Products") . . .

(*Id.* Ex. 3.)

■ The Agreement is governed by Illinois law. The issue is whether Total Control was appointed to represent, and

thus is entitled to receive commission for, Dynapar's entire product line. Under Illinois law, the provisions of a contract should be interpreted according to their plain and ordinary meaning. *Grundstad v. Ritt,* 166 F.3d 867, 871 (7th Cir.1999). If the terms of a written agreement are unambiguous, the intent of the parties must be gleaned from the contract language. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 394 (7th Cir.2003) (*citing Western Illinois Oil Co. v. Thompson,* 26 Ill.2d 287, 186 N.E.2d 285, 287 (1962)). The threshold issue is, therefore, whether a contract is ambiguous. This issue is a question of law to be determined by the court. *Cromeens,* 349 F.3d at 394. A contract is not deemed ambiguous simply because the parties disagree about the meaning of a contractual provision. *Interim Health Care of N. Ill., Inc. v. Interim Health Care, Inc.,* 225 F.3d 876, 879 (7th Cir.2000).

If a contract is deemed unambiguous, its provisions are to be construed by a court. *Kallman v. Radioshack Corp.,* 315 F.3d 731, 735 (7th Cir.2002). If a contract is ambiguous, however, the meaning of the contract is a question of fact to be determined by the jury. *N. Shore Gas Co. v. Salomon Inc.,* 152 F.3d 642, 652 (7th Cir.1998). Nonetheless, when a contract contains ambiguous language, and a court determines that a reasonable person could reach only one conclusion about the meaning of that language after considering the extrinsic evidence, the meaning of the contract language is to be determined by the court. *Wald v. Chicago Shippers Ass'n,* 175 Ill.App.3d 607, 125 Ill.Dec. 62, 529 N.E.2d 1138, 1146 (1988).

The Agreement unambiguously states that Dynapar appointed Total Control as a sales agent of certain products, specifically Dynapar name brand digital equipment and controls. Because the Agreement is unambiguous, the intent of the Agreement is to be construed from the plain and ordinary meaning of its terms. The terms of the Agreement make it clear that the parties intended for Total Control to only represent Dynapar products that are digital equipment and controls.

The February amendment is similarly unambiguous. The relevant part of the February 21, 1991 amendment states:

3. Effective April 1, 1991, all products currently sold by the Veeder–Ro [rest unintelligible] Digital Products Group which shall be merged with the Dynapar product line, shall be included as part of this Representative Agreement.

4. All other terms and conditions of the original agreement and subsequent addendum shall remain the same.

(Pl. Mem. Opp'n D's Mot. Summ. J. Ex. 3 at 14.)

The amendment augments the products Total Control represents to include all products that: 1) were sold by the Veeder Root Digital Products Group in 1991, and 2) were merged into the Dynapar product line. The terms of the amendment plainly limit the expansion of the Agreement to products that meet both of the amendment's conditions. Because Illinois law precludes interpreting the amended Agreement any broader than its unambiguous terms, the plain language of the amended Agreement limits Total Control only to commissions on Dynapar products that are digital equipment and controls and products that were both sold by the Veeder Root Digital Products Group in 1991 and merged into the Dynapar product line. I therefore grant defendant's motion for summary judgment on this issue.

### B. Products Converted from "I"mmature to "M"ature

Total Control claims that it is entitled to commissions earned on prod-

ucts that Danaher unilaterally reclassified from the "I"mmature category to the "M"ature category.[10] Total Control argues that the relevant amendment to the Agreement authorizes Danaher to reduce the commissions it paid on certain products by characterizing them as mature for the year of 1994 only. Total Control further argues that notice and approval from Total Control was required before classifying products after 1994.

As with the issue above, this breach of contract claim requires interpretation of the Agreement. On November 12, 1993, a letter was sent to the President of Total Control from Danaher. The letter stated, in relevant part:

> This letter and the contents therein will serve as an amendment to the current contract between Total Control and Danaher Controls for representation in the prescribed territory.
>
> Effective January 1, 1993, Total Control will commence representation of the Eagle Signal Products which have become part of the Danaher Controls Product line.
>
> Effective on or about January 1, 1994, Danaher Controls shall begin designation of product classes as offered through its Distributor sales organizations into "M"ature and "I"mmature. This product designation shall be for all products including Eagle products sold through distribution.
>
> Effective January 1st, 1994, those products designated as "M"ature shall be subject to a commission rate of 3% and those designated as "I"mature shall be subject to a commission rate of 10%. This amendment shall effect only those items specifically discussed above and shall not effect any other terms or conditions of the existing contract.

(Pl. Mem. Opp'n D's Mot. Summ. J. Ex. 3 at p. 15.)

Again, Illinois law governs the interpretation of the agreement. The issue is whether Danaher can revise a product's category after the initial designation on January 1, 1994. The amendment states that "Effective on or about January 1, 1994, Danaher Controls shall begin designation of product classes as offered through its Distributor sales organizations into 'M'ature and 'I'mmature." The plain meaning of "begin" is "to originate; to come into existence; to start; to institute; to initiate; to commence." *Black's Law Dictionary* 155 (6th ed.1990). I find that the text of the amendment is unambiguous. The plain meaning of the amendment is that at or around January 1, 1994, Danaher will start designating product classes into mature and immature categories. The amendment does not limit Danaher's right to classify products to only the year 1994. To the contrary, the amendment clearly states, through the use of the term "begin," that Danaher can designate the product's classification at any time after January 1, 1994. Because Danaher is free to designate a product's classification, Danaher necessarily has the right to reclassify a product any time after January 1, 1994 as well. There is also nothing in the amendment requiring that any notice be given to Total Control before a product is classified. Because the amendment is unambiguous, it would be improper under Illinois law to look beyond the four corners of the Agreement to find such a requirement. Thus, I decline to find any requirement that Danaher provide Total Control notice before reclassifying a product. Because Danaher's right to classify products includes the right to reclassify products, and because Total Control is not entitled

---

**10.** Henceforth referred to as "immature" and "mature."

to any notice prior to the reclassification, the plain language of the amendment dictates that Total Control is not entitled to commissions on products converted from the immature category to the mature category. Therefore, I grant defendant's motion for summary judgment on this issue.

## IV. Disputed Issues of Material Fact

The following are some of the disputed issues of material fact:

*Count I* [11]

- Whether the Agreement which permits Danaher to "handle directly any account in the agent's territory" authorizes Danaher to sell directly to clients in Total Control's territory without paying Total Control commissions on those accounts;
- What time period is referred to by the term "prior year" in the December 1988 amendment;
- What sales are included in Total Control's total sales for the purposes of qualifying for 120 day notice prior to termination;
- Whether Veeder–Root products # s 7303, 7305, 7443, 7444, 7445, 7456, and 9930 are digital equipment and controls;
- Whether the Veeder Root vote counting machines were sold by the Veeder Root Digital Products Group as of April 1, 1991;
- Whether the Veeder Root vote counting machines are digital equipment and controls;
- Whether Veeder Root product # 2030 (renumbered as 8010 in 2001) is a digital equipment and control;
- Whether Veeder Root product # 2030 (renumbered as 8010 in 2001) was sold directly by Danaher to clients in Total Control's territory;

- Whether Total Control sold product lines which competed against Danaher's products;
- Whether any non-performance on the part of Total Control is material.

*Count III*

- Whether Total Control qualifies as a sales representative, i.e., whether Total Control solicits wholesale orders from retailers rather than consumers.

## ORDER

AND NOW, this first day of July, 2004, upon consideration of Defendant's motion for summary judgment (docket # s 89 and 90), Plaintiff's response (docket # 92), Defendant's reply (docket # 98), Plaintiff's sur-reply (docket # 108), and after oral argument, **IT IS ORDERED** that Defendant's summary judgment motion (docket # s 89 and 90) is **GRANTED** in part and **DENIED** in part consistent with this explanation.

---

11.   Some of these disputed issues are related to others and may not be reached.