Mefusion, Inc. v. Allscripts Healthcare Solutions, Inc., 2015 NCBC 31.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 5192

MEDFUSION, INC., )
          Plaintiff )
 )
       v. )
 )
ALLSCRIPTS HEALTHCARE SOLUTIONS, )
INC., )
         Defendant )

**OPINION AND ORDER ON
MOTION TO DISMISS**

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Defendant's Motion to Dismiss Amended Complaint ("Motion to Dismiss") pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)"). On January 9, 2015, the Court held a hearing on the Motion to Dismiss.

THE COURT, after considering the Motion to Dismiss, briefs in support of and in opposition to the Motion to Dismiss, arguments of counsel and other appropriate matters of record, CONCLUDES that the Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons stated herein.

> *Poyner Spruill LLP by Keith H. Johnson, Esq. and Steven B. Epstein, Esq. for Plaintiff Medfusion, Inc.*

> *Wood Jackson, PLLC by W. Swain Wood, Esq. and Emily Moseley, Esq., and Vedder Price, P.C. by Derek Zolner, Esq. for Defendant Allscripts Healthcare Solutions, Inc.*

McGuire, Judge.

PROCEDURAL HISTORY

1. Plaintiff Medfusion, Inc. ("Plaintiff") initiated this action on May 15, 2014, by filing its original Complaint. On August 11, 2014, Plaintiff filed its Amended Complaint,

asserting the following causes of action ("Claim(s)"): Claim One (Breach of Contract); Claim Two (Fraudulent Inducement); Claim Three (Fraud); Claim Four (Unfair Methods of Competition in Violation of G.S. § 75-1.1); and Claim Five (Unfair or Deceptive Trade Practices in Violation of G.S. § 75-1.1).

2. On September 15, 2014, Defendant Allscripts Healthcare Solutions, Inc. ("Defendant") filed its Motion to Dismiss. Pursuant to an Order on Motion to File Under Seal, entered on November 4, 2014, the Exhibits to the Motion to Dismiss were filed under seal.

3. The Motion to Dismiss has been fully briefed[1] and argued, and is ripe for determination.

FACTUAL BACKGROUND

Among other things, the Amended Complaint alleges that:

4. Plaintiff is a health care software and internet technology company headquartered in Wake County, North Carolina.[2]

5. Defendant is a medical software company headquartered in Chicago, Illinois.[3]

6. Plaintiff offers patient portal messaging services to health care providers. These services enable patients and physicians to communicate securely online for purposes such as requesting prescription refills, making appointments, paying bills, reviewing lab results and exchanging other communications.[4]

7. Defendant provides "an array of software solutions for creating and managing electronic health care records and providing practice management solutions."[5]

---

[1] Pursuant to an Order on Motion for Leave to File Sur-Reply, entered on Oct. 31, 2014, the parties were granted leave to file additional briefs limited to a discussion and analysis of *Gardensensor, Inc. v. Stanley Black & Decker, Inc.*, 2014 U.S. Dist. LEXIS 135302 (N.D. Cal. Sept. 24, 2014).

[2] Am. Compl. ¶ 1.

[3] *Id.* ¶ 4.

[4] *Id.* ¶ 2.

[5] *Id.* ¶ 4.

8. On July 7, 2009, the Parties entered into their 2009 Patient Access Solution Agreement ("Agreement") and agreed to "integrate [Plaintiff's] technology with [Defendant's] health care software solutions to create an online patient portal (the "Portal"), and to market the Portal to health care providers."[6] As part of the Agreement, Defendant agreed to use commercially reasonable efforts to market and sell the Portal.[7] Defendant would enter into End User Agreements ("EUA(s)"), whereby End Users purchased the rights to the Portal for a specific term and committed to pay Defendant monthly subscription fees.[8] Once the EUA was accepted by Plaintiff, Defendant would pay Plaintiff for Plaintiff's services pursuant to a fee schedule in the Agreement.[9]

9. In April 2010, following the initiation of the federally sponsored Meaningful Use program which required health care providers to use certified electronic health records technology, the parties executed the First Amendment to the Agreement ("First Amendment"). The First Amendment was intended to address the "unique marketing and sales opportunity" created by the Meaningful Use program. Under the First Amendment, Defendant agreed to take certain additional efforts to market Plaintiff's services in exchange for Plaintiff's contribution of funds to a "co-marketing fund used to market the Portal."[10]

10. On August 1, 2011, the parties executed a Second Amendment and Addendum to the Agreement ("Second Amendment"). The Second Amendment was intended to cure a backlog of orders for the Portal caused by Defendant's delaying Portal implementation and billing. The Second Amendment required Defendant to use best efforts to include terms in EUAs that enabled implementation of the Portal and client billing within 30 days of signing

---

[6] Am. Compl. ¶ 6.
[7] *Id.* ¶ 8.
[8] *Id.* ¶ 9.
[9] *Id.* ¶ 10.
[10] *Id.* ¶¶ 14-17.

the EUA.[11] Under the Second Amendment, Defendant also agreed to offer the Portal by default in every "EHR Enterprise" and "EHR Pro" product offering, and to embed the Portal in all net new "EHR/PM" deals for its "Professional" and "Enterprise" market segments, with case-by-case exceptions.[12] Defendant agreed to represent that the Portal was Defendant's "only preferred Patient Portal solution."[13]

11. The Second Amendment also addressed certain enhancements to the Portal that Defendant was to integrate with other of its services.[14] Additionally, in exchange for Defendant's commitments in the Second Amendment, the parties agreed, "effective as of the date of the Second Amendment, that [Defendant] would receive 55% and [Plaintiff] would receive 45% of all *net* revenues and recurring charges (*after* payment to [Plaintiff] for its costs of goods)" for Portal sales carried out pursuant to the Second Amendment.[15]

12. In February 2013, Defendant acquired Jardogs, LLC ("Jardogs").[16] Jardogs had a patient messaging service called FollowMyHealth that competed with Plaintiff's Portal. Following the acquisition of Jardogs, Defendant announced that it would make FollowMyHealth "available across all [Defendant's] products,"[17] which Defendant began to do before the five-year term of the Agreement expired in July 2014.[18]

13. Plaintiff alleges that after Defendant acquired Jardogs, Defendant no longer marketed the Portal as Defendant's only preferred portal, as required in the Second Amendment, and instead circulated comparisons between the Jardogs product and Plaintiff's

---

[11] Am. Compl. ¶¶ 19-22.
[12] *Id.* ¶¶ 23-25.
[13] *Id.* ¶ 26.
[14] *Id.* ¶¶ 27-28.
[15] *Id.* ¶ 30 (emphasis in original).
[16] *Id.* ¶¶ 31-34.
[17] *Id.* ¶ 36.
[18] *Id.* ¶ 38.

services.[19] Plaintiff additionally alleges that Defendant began to market FollowMyHealth as an alternative service to customers using the Portal.[20]

14.     Plaintiff alleges that Defendant, as the first point of customer contact for Portal support, failed to give Plaintiff any notice of technical issues experienced by End Users, thereby limiting Plaintiff's ability to resolve the issue.[21]

15.     Following the execution of the Second Amendment, and while negotiating to purchase Jardogs, Defendant "took a new interpretation" of the revenue allocation provisions in the Second Amendment.[22] Under this new interpretation, Defendant contended that Plaintiff "was no longer entitled to payment for its costs of goods sold *before* revenue was allocated between the parties, but instead it was *gross* revenue . . . allocated between them."[23] Defendant also began to contend that the 55-45% allocation formula applied to pre-existing End User accounts, not just those carried out under the Second Amendment's marketing plan.[24]

16.     On April 14, 2014, after Defendant's failure to timely pay to Plaintiff more than $5,460,627.64 under the Agreement, Plaintiff sent Defendant a notification of breach of the Agreement. Following the notification, Defendant sent $993,540.80 in payments to Plaintiff but claimed that Defendant now disputed the remaining amount "in good faith."[25] On April 24, 2014, Plaintiff terminated the Agreement based on Defendant's failure to cure the breach.[26]

---

[19] Am. Compl. ¶¶ 44-45.
[20] *Id.* ¶¶ 53-55.
[21] *Id.* ¶¶ 50-51.
[22] *Id.* ¶ 57.
[23] *Id.* ¶ 58.
[24] *Id.* ¶ 59.
[25] *Id.* ¶¶ 63-69.
[26] *Id.* ¶ 70.

17.     Following the termination of the Agreement, Plaintiff alleges that Defendant has made a number of false and misleading statements to Portal End Users regarding the termination of the Agreement, that continued support for the Portal was "up in the air" even after Plaintiff promised to continue to provide support, that Plaintiff was going out of business, that Plaintiff's service would not comply with the Meaningful Use requirements, and that the only way to comply with Meaningful Use requirements would be to switch to FollowMyHealth.[27] Plaintiff alleges that Defendant has continued to use the termination of the Agreement, and misleading statements concerning the plans and capabilities of Plaintiff, to convert users from Plaintiff's products to FollowMyHealth.[28]

18.     Based on these factual allegations, Plaintiff asserts its claims for breach of contract, fraudulent inducement, fraud, unfair methods of competition, and unfair and deceptive trade practices.

<u>DISCUSSION</u>

19.     In the Motion to Dismiss, Defendant seeks dismissal pursuant to Rule 12(b)(6) of Claim One, to the extent that Claim is barred by the limitation of liability provision in the parties' Agreement and dismissal of Claims Two, Three, Four, and Five in their entirety.

20.     The Court, in deciding a Rule 12(b)(6) motion, treats the well-pleaded allegations of the complaint as true and admitted. *Sutton v. Duke*, 277 N.C. 94, 98 (1970). However, conclusions of law or unwarranted deductions of fact are not deemed admitted. *Id.* The facts and permissible inferences set forth in the complaint are to be treated in a light most favorable to the nonmoving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156 (1986). As our Court of Appeals has noted, the "essential question" raised by a Rule 12(b)(6) motion is "whether the complaint, when liberally construed, states a claim upon which relief

---

[27] Am. Compl. ¶ 73.
[28] *Id.* ¶¶ 76-83.

can be granted on any theory." *Barnaby v. Boardman*, 70 N.C. App. 299, 302 (1984) (citations omitted), *rev'd on other grounds*, 313 N.C. 565 (1985). A motion to dismiss should be granted only if "it appears certain that [the plaintiff] can prove no set of facts which would entitle [it] to relief under some legal theory." *Fussell v. N.C. Farm Bureau Mut. Ins. Co.*, 364 N.C. 222, 225 (2010).

### Claim One: Breach of Contract[29]

21.     At the outset, the Court notes that the Motion to Dismiss does not seek dismissal of Claim One to the extent it seeks "recovery of unpaid amounts for past services rendered."[30] Instead, the Motion to Dismiss seeks dismissal of Claim One only to the extent that Claim seeks damages beyond those unpaid amounts, in violation of the limitation of liability provision in the parties' Agreement.

22.     That provision, contained in Section 10.1 of the Agreement, provides, in full:

> IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOSS OR DAMAGE TO REVENUES, PROFITS, OR GOODWILL OR OTHER SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OF ANY KIND, RESULTING FROM ITS PERFORMANCE OR FAILURE TO PERFORM UNDER THIS AGREEMENT OR ANY OF THE ATTACHMENTS HERETO, AND, IN THE CASE OF MEDFUSION, RESULTING FROM THE FURNISHING, PERFORMANCE, OR USE OR LOSS OF USE OF ANY MEDFUSION PATIENT MESSAGING SOLUTION OR OTHER MATERIALS DELIVERED TO ALLSCRIPTS HEREUNDER, INCLUDING, WITHOUT LIMITATION, ANY INTERRUPTION OF BUSINESS, WHETHER RESULTING FROM BREACH OF CONTRACT, BREACH OF WARRANTY, OR ANY OTHER CAUSE (INCLUDING NEGLIGENCE), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL NOT LIMIT A PARTY'S INDEMNIFICATION OBLIGATIONS UNDER ARTICLE IX WITH RESPECT TO THIRD PARTY CLAIMS, AND SHALL NOT APPLY TO BREACHES OF CONFIDENTIALITY UNDER ARTICLE XI OR INFRINGEMENT BY EITHER PARTY OF THE OTHER PARTY'S INTELLECTUAL PROPERTY OR VIOLATIONS OF A PARTY'S

---

[29] The parties are in agreement that Illinois law applies to the breach of contract claim pursuant to the choice of law provisions in the Agreement and amendments. North Carolina law applies the other causes of action in the Complaint.
[30] Mot. Dismiss ¶ 4.

OBLIGATIONS IN CONNECTION WITH HIPAA OR OTHER SUCH LAWS AND REGULATIONS THAT MAY APPLY TO THIS AGREEMENT.[31]

23.    In support of the Motion to Dismiss, Defendant contends that this limitation of liability provision ("LOL Provision") contained in Section 10.1 of the Agreement is valid, enforceable, and unambiguously excludes damages for lost revenue and lost profits, regardless of whether the same are considered direct or consequential damages.

24.    In response to the Motion to Dismiss, Plaintiff contends, first, that the LOL Provision is unenforceable under Illinois law because the provision is ambiguous. Second, Plaintiff argues that, even if the LOL Provision is enforceable, it does not cover the damages Plaintiff seeks to recover in this action. Specifically, Plaintiff argues the phrase "or other special, incidental, indirect, or consequential damages of any kind" qualifies "loss or damage to revenues, profits, or goodwill" such that those damages are only excluded to the extent they are considered consequential damages. Finally, Plaintiff argues that the LOL Provision does not limit Defendant's liability for any intentional conduct and, therefore, Defendant's "attempt to utilize that clause to defeat [Claims Two through Five] fails as a matter of law."[32]

25.    Under Illinois law, "parties can limit remedies and damages for breach if their agreement so states and no public policy bar exists." *Rayner Covering Systems, Inc. Danvers Farmers Elevator Co.*, 589 N.E.2d 1034, 1037 (Ill. App. Ct. 1992). Outside of publicly regulated activities such as those involving, for example, common carriers or relationships between landlords and tenants, Illinois law reflects "a wide-spread policy of permitting competent parties to contractually allocate business risks as they see fit." *McClure*

---

[31] Mot. Dismiss, Ex.1, § 10.1 (Although the Agreement was filed under seal, both parties have quoted this section in briefs not filed under seal) (hereinafter, citations to the Patient Access Solution Agreement will be to "Agreement").

[32] Pl.'s Memo. Opp. Mot. Dismiss 13. Because the Court finds that Plaintiff's Claims Two through Five, to the extent they address issues governed by the Agreement, are barred by the economic loss rule, the Court need not address whether those claims would be independently barred by application of the LOL Provision.

*Engineering Assocs., Inc. v. Reuben H. Donnelley Corp.*, 447 N.E.2d 400, 402 (Ill. 1983). Accordingly, Illinois courts will enforce waivers of consequential and incidental damages unless the waiver at issue is unconscionable. *Tradewinds Aviation, Inc. v. Jet Support Servs.*, 2004 U.S. Dist. LEXIS 19380, at *16 (N.D. Ill. Sept. 27, 2004). Despite the willingness of Illinois courts to enforce limitations of liability, such limitations remain "disfavored, and [are] strictly construed against the party seeking to enforce the exculpatory provisions." *IMR USA, Inc. v. GES Exposition Serv.*, 2005 U.S. Dist. LEXIS 6301, at *17, n.4 (N.D. Ill. Mar. 31, 2005). A limitation of liability clause "must spell out the intention of the parties with great particularity and will not be construed to defeat a claim which is not explicitly covered by [its] terms." *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 493 N.E.2d 1022, 1029-30 (Ill. 1986).

26. In determining whether the LOL Provision is enforceable, the Court must first determine whether or not provision is ambiguous. "Whether a contact is ambiguous is a question of law for the court." *Wald v. Chicago Shippers Ass'n.*, 529 N.E.2d 1138, 1145 (Ill. App. Ct. 1988) (internal citation omitted). A limitation of liability clause, like any other contractual provision, is ambiguous if "the language used is susceptible to more than one meaning." *Id.* "Where there is an ambiguity arising from the terms of a contract, the meaning may be derived from extrinsic facts surrounding formation." *Id.*, 529 N.E.2d at 1146. If a contract is found ambiguous, the parties should generally be permitted to present extrinsic evidence and, therefore, it is generally improper to grant a motion to dismiss. *See Lake County Trust Co. v. Two Bar B, Inc.*, 537 N.E.2d 1015, 1020 (Ill. App. Ct. 1989) (holding that court's grant of a motion to dismiss before allowing presentation of extrinsic evidence was improper once court found contractual language ambiguous).

27. The parties' disagreement over the meaning of the LOL Provision centers primarily around the impact of a single comma before the phrase "or goodwill or other special,

incidental, indirect, or consequential damages of any kind. . . ." Defendant contends that the comma before "or goodwill" is an Oxford, or serial, comma that sets apart three independent categories of damages barred by the agreement. First, under this interpretation, lost revenues are barred. Second, the agreement bars lost profits. Third, the agreement bars goodwill or other special, incidental, indirect, or consequential damages of any kind. Under this analysis, the phrase "or other . . . consequential damages" only modifies "goodwill" and not lost revenue or lost profits. Accordingly, Defendant argues, lost revenue and lost profits, the damages Plaintiff is seeking here, are excluded by the LOL Provision even if they are not considered special or consequential damages.

28.     Plaintiff, on the other hand, argues that the "or other . . . consequential damages" language modifies "revenues, profits, or goodwill" to make clear that these categories of damages are only excluded to the extent that they are considered consequential. Under this interpretation, Plaintiff would only be excluded from recovering lost profits that are consequential damages. To the extent lost profits constitute direct damages, they are not barred by the LOL Provision under Plaintiff's interpretation of that clause.

29.     Ultimately, at this stage in the litigation, the Court finds that the LOL Provision is reasonably susceptible to either interpretation, and is, therefore, ambiguous. While Defendant's argument as to the use of the Oxford comma within the LOL Provision appears logical, the use of such a comma is not at all consistent within the broader language of the Agreement. Indeed, the section that immediately precedes the LOL Provision does not use the Oxford comma,[33] nor does the section immediately following the LOL Provision use the Oxford comma, even in a numbered list.[34] Accordingly, the Court simply cannot conclude,

---

[33] *See* Agreement § 9.2(a).
[34] *See* Agreement § 11.1.

as it must to grant the Motion to Dismiss, that Defendant's interpretation of the LOL Provision is the only reasonable interpretation of that provision as a matter of law.

30.     However, the Court's conclusion that the LOL Provision is susceptible to more than one meaning and is, therefore, ambiguous, does not mean that the clause is unenforceable, as Plaintiff argues. In support of its position that "[a]mbiguous limitations of liability are unenforceable altogether" and that these provisions "may only be enforced if their language is 'clear, explicit and unequivocal,'" Plaintiff relies on *Jewelers Mutual Insurance Company v. Firstar Bank Illinois*, 792 N.E.2d 1 (Ill. App. Ct. 2003). In that case, however, the parties specifically defined their relationship as landlord and tenant, thereby invoking Illinois' Landlord and Tenant Act. *Id.* at 5. The Landlord and Tenant Act placed specific limits on the ability of landlords and tenants to include exculpatory clauses governing certain liability. *Id.* The court found that, "by agreeing to a landlord-tenant relationship, the parties necessarily agree[d] to be bound by the laws governing that relationship," including the restrictions on, and heightened public policy concern for, limitations of liability. *Id.* at 7.

31.     Here, the relationship between the parties, as alleged in the Amended Complaint, appears to involve an arms-length commercial transaction between parties with relatively equal bargaining power. Accordingly, the statutory restrictions and public policy concerns in *Jewelers Mutual Insurance Company* are simply not present in the instant action. Instead, assuming some ultimate interpretation of the LOL Provision may be found, that clause should be enforced between these "competent parties." *See McClure Engineering Assocs.*, 447 N.E.2d at 402.

32.     Notwithstanding the parties' differing interpretations of the LOL Provision, both parties appear to agree that the LOL Provision would bar recovery of lost profits and lost revenue if those damages were consequential. In support of the Motion to Dismiss, Defendant also argues that all the alleged damages that are subject to the motion are

consequential and, therefore, barred even if the Court were to reject its interpretation of the LOL Provision.

33. Under Illinois law, direct damages, as opposed to consequential damages, are those that "the law presumes follow the type of wrong complained of." *Westlake Fin. Grp. v. CDH-Delnor Health Sys.*, 2015 IL App. (2d) 140589, ¶ 31, __ N.E.3d __, __ (Jan. 6, 2015) (quoting Black's Law Dictionary 394 (7th ed. 1999)). Direct damages are often referred to as "loss of bargain" damages or "expectation damages" because they are generally concerned with putting the non-breaching party in the same position it would have been in absent a breach by giving that party the benefit of his bargain. *See McBaldwin Fin. Co. v. DiMaggio*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006). Consequential damages consist of "loss or injury that does not flow directly and immediately from the wrongful act of a party but are the consequences or results of such an act." *Hartford Accident. & Indemnity. Co. v. Case Found. Co.*, 294 N.E.2d 7, 14 (Ill. App. Ct. 1973). Under Illinois law, lost profits can be considered either direct or consequential damages, depending on the situation. *See Westlake Fin. Grp.*, 2015 IL App. (2d) 140589, ¶ 32 (recognizing that "lost profits can be categorized as either direct or consequential damages") (citing *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 67 (Ill. 1987)).

34. Turning to the allegations in the Amended Complaint, Plaintiff has alleged that the parties entered the Agreement to market the Portal to medical providers.[35] Plaintiff alleges that Defendant agreed to undertake certain obligations including, *inter alia*, duties regarding sales and marketing of the Portal, providing training to customers, integrating the Portal with various products offered by Defendant, and taking certain steps to ensure service enhancements were put into use.[36] In consideration for those duties, and those undertaken

---

[35] Am. Compl. ¶ 6.
[36] *Id.* ¶ 88.

by Plaintiff, the parties agreed to a specific profit sharing arrangement.[37] Taking these allegations as true, as required at the motion to dismiss stage, the Amended Complaint alleges a contractual arrangement in which the lost profits at issue in this case were clearly part of the bargain between the parties and flowed directly from the alleged breach. *See Midland Hotel Corp.*, 515 N.E.2d at 67 (finding that, based on the nature of the agreement between the parties, the plaintiff's lost profits were a direct consequence of the breach).

35.     Ultimately, at this stage of the litigation, the Court finds that the LOL Provision is susceptible to more than one interpretation, and is, therefore, ambiguous. Furthermore, because Plaintiff has stated a claim for some damages that might be direct, and therefore recoverable under Plaintiff's interpretation of the LOL Provision, the Court finds that the Motion to Dismiss should be DENIED as to Claim One.

### Claim Two: Fraudulent Inducement

36.     In its fraudulent inducement claim, Plaintiff alleges that Defendant made a number of representations during the parties' negotiation of the Second Amendment, that those representations were incorporated into the Second Amendment, and that Defendant made those representations with the intent to deceive Plaintiff and did in fact deceive Plaintiff.[38]

37.     To state a claim for fraudulent inducement, a plaintiff must allege that

(i) [the] defendant made a false representation or concealed a material fact he had a duty to disclose; (ii) that the false representation related to a past or existing fact; (iii) that defendant made the representation knowing it was false or made it recklessly without knowledge of its truth; (iv) that defendant made the representation intending to deceive plaintiff; (v) that plaintiff reasonably relied on the representation and acted upon it; and (vi) plaintiff suffered injury.

*Harton v. Harton*, 81 N.C. App. 295, 298-299 (1986).

---

[37] Am. Compl. ¶ 30.
[38] *Id.* ¶¶ 90-100.

38.     In support of its Motion to Dismiss, Defendant argues that Plaintiff's fraudulent inducement claim is barred by the economic loss rule and, even if not barred, is not pleaded with sufficient specificity under Rule 9. Because the Court concludes that Plaintiff's fraudulent inducement claim is barred by the economic loss rule, it need not address Defendant's argument under Rule 9.

39.     Our Supreme Court, in its seminal opinion on the economic loss rule, stated the rule in its essential form: "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81 (1978). This is logically related to the tenet that "parties to a contract . . . generally owe no special duty to one another beyond the terms of the contract." *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61 (1992). For that reason, "a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract . . . when the injury resulting from the breach is damage to the subject matter of the contract." *Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741-42 (1992) (internal citations omitted). While the economic loss doctrine's theoretical origins lie in the products liability realm,[39] courts have applied the doctrine "to bar tort claims that 'piggyback' breach of contract claims outside of the products liability context." *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC 41 ¶ 91 (N.C. Super. Ct. Nov. 3, 2011). The economic loss rule is intended to protect the expectations of contracting parties by seeking to prevent parties from improperly attempting to obtain the benefits of a bargain they did not make. *See E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986). The rule is also generally concerned with attempting to keep contract law from "drowning in a sea of tort." *Id.* at 866 (citations omitted).

---

[39] *See, e.g., Seely v. White Motor Co.*, 63 Cal. 2d 9 (1965); *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986).

40.     In order to give rise to a tort claim in the context of a contractual relationship, "a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract." *Gregory Woods Prods. v. Advanced Sawmill Mach. Equip., Inc.*, 2007 U.S. Dist. LEXIS 46245, at *25 (W.D.N.C. 2007) (internal citations omitted).

41.     Although some jurisdictions, and even some jurists in North Carolina,[40] might allow a fraudulent inducement claim to satisfy this independent duty requirement, "North Carolina courts have been wary of enlarging this exception for fear of destroying the wall between contract and tort entirely." *Gregory Woods Prods.*, 277 U.S. Dist. LEXIS 46245 at *26 (citing *Coker v. DaimlerChrysler Corp.*, 2004 NCBC 1 (N.C. Super. Ct. Jan. 5, 2004), *aff'd on other grounds*, 172 N.C. App. 386 (2005)). Indeed, courts applying North Carolina's economic loss doctrine have held that even fraudulent statements regarding the performance of a contract do not allege sufficiently "distinct and identifiable facts outside of contract performance." *Mecklenburg County v. Nortel*, 2008 U.S. Dist. LEXIS 110381, at *12-13 (W.D.N.C. 2008) (recognizing that, even though plaintiff "ma[de] a compelling argument that Nortel tortuously made representations to the County which induced the County to continue the contract, make payments, and sign the addendum," because the "heart of [the plaintiff's] allegation [was] the performance of the contract," the economic loss rule barred the tort claims based on those fraudulent statements).

42.     Here, the heart of Plaintiff's allegations is the performance of the terms of the Agreement and the amendments thereto. Plaintiff alleges that a number of misrepresentations were made during the course of negotiating the Second Amendment. Plaintiff specifically alleges that these representations were incorporated into the Second Amendment, thereby giving Defendant a contractual duty to perform according to its

---

[40] *See Coker v. DaimlerChrysler Corp.*, 172 N.C. App. 386, 405 (2005) (Hudson, J., dissenting).

representations.[41] Plaintiff then seeks damages for purely economic loss incurred by the failure of Defendant to perform according to the terms of the Second Amendment.[42]

43.    As in *Nortel*, the fact that Plaintiff argues that Defendant was "fraudulent in its statements regarding this performance . . . does not change the fact that these statements were directly related to [Defendant's] performance of the essential portions of the contract." *Nortel*, 2008 U.S. Dist. LEXIS 110381, at *13. Accordingly, the economic loss doctrine confines Plaintiff's relief to its breach of contract claim and bars Plaintiff's claim for fraudulent inducement. Therefore, the Motion to Dismiss should be GRANTED as to Claim Two.

### Claim Three: Fraud

44.    In Claim Three, Plaintiff alleges that Defendant "had a duty to communicate to [Plaintiff] any technical support issues reported by an End User . . . for which [Plaintiff] may be responsible."[43] Plaintiff alleges Defendant breached this duty by failing to "follow agreed upon protocols for communicating such issues" to Plaintiff.[44] Instead of following those procedures, Plaintiff alleges Defendant unilaterally waived or reduced fees, stopped billing the End User, or allowed the End User to prematurely cancel its EUA, causing economic harm to Plaintiff.[45]

45.    To state a claim for fraud, a plaintiff must allege, with the specificity required by Rule 9(b): (1) a false representation or concealment of a past or existing material fact; (2) that is reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in

---

[41] Am. Compl. ¶¶ 95, 98.
[42] *Compare id.* ¶ 88 (asserting contract claim for, *inter alia*, breach of Second Amendment) *with id.* ¶¶ 90-100 (asserting that Plaintiff was fraudulently induced into executing the Second Amendment).
[43] *Id.* ¶ 103.
[44] *Id.* ¶ 106.
[45] *Id.*

fact deceive; (5) resulting in damage to the plaintiff. *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009).

46. As with its claim for fraudulent inducement, Plaintiff's fraud-by-omission claim rests on Defendant's alleged failure to comply with the terms of the Agreement. Exhibit H to the Agreement specifically addresses the obligations of the parties in providing maintenance and support for the Portal.[46] Section 5 of Exhibit H to the Agreement specifically governs how and when the parties would communicate in the event of system error, and when updates would be provided. Because the "protocols for communicating" system issues are established in the parties' contract, the heart of Plaintiff's fraud claim is Defendant's performance of those contractual obligations.

47. Although a party can recover in tort if they allege a duty "separate and distinct from any duty owed under a contract," Plaintiff has not alleged any such duty. *See Gregory Woods Prods.*, 2007 U.S. Dist. LEXIS 46245, at *25. The only duty to disclose that Plaintiff has alleged in the Amended Complaint arises directly from the Agreement.[47] Indeed, in response to Defendant's contention that Plaintiff has not pleaded its fraud claim with sufficient particularity under Rule 9(b), Plaintiff indicates that the relationship that gave rise to the duty to speak was the "[e]ntry of the Patient Access Solution Agreement, and amendments thereto, under which Allscripts was the customer's primary, if not sole, point of contact for technical support."[48] Ultimately, the only duty to disclose technical issues with the Portal alleged by Plaintiff is the contractual obligation in the Agreement. Therefore, any recovery for a breach of that duty lies in a breach of contract claim, not a fraud claim.

---

[46] Mot. Dismiss, Exh.1 (filed under seal).
[47] *See* Am. Compl. ¶ 106 (alleging Defendant failed to "follow agreed upon protocols").
[48] Pl.'s Memo. Opp. Mot. Dismiss 22.

48.     Accordingly, as with its claim for fraudulent inducement, Plaintiff's remedy is confined to a contract claim as its fraud claim is barred by the economic loss rule. For these reasons, Defendant's Motion to Dismiss should be GRANTED as to Claim Three.

### Claims Four and Five: Violation of G.S. § 75-1.1

49.     In Claim Four, Plaintiff alleges that Defendant's conduct after it acquired Jardogs and "FollowMyHealth," including, inter alia, preventing Plaintiff from including enhancements in the Portal, providing insufficient support for the Portal, marketing FollowMyHealth to users of the Portal, failing to pay Medfusion for costs of goods sold, and applying the Second Amendment's revenue sharing provision to pre-existing accounts constitutes an unfair method of competition in violation of G.S. § 75-1.1.[49] Plaintiff also contends that certain conduct of Defendant following the termination of the Agreement, including making false and misleading statements regarding Plaintiff and the Portal, constitute an unfair method of competition.[50] In Claim Five, Plaintiff alleges that the same conduct outlined above constitutes unfair or deceptive trade practices in violation of G.S. § 75-1.1, and this claim appears to be co-extensive with Claim Four.[51]

50.     G.S. § 75-1.1 declares unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." To state a claim under G.S. § 75-1.1, a plaintiff must allege (1) that the defendant committed an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or his business. *Birtha v. Stonemor, N. Carolina, LLC*, 220 N.C. App. 286, 298 (2012), *disc. rev. denied*, 366 N.C. 570 (2013). An act or practice "is deceptive if it has the capacity or tendency to deceive." *Ace*

---

[49] Am. Compl. ¶¶ 109-17.
[50] *Id.*
[51] *Id.* ¶¶ 118-20.

*Chemm. Corp. v. DSI Transp., Inc.*, 115 N.C. App. 237, 247 (1994) (internal citations omitted). As the North Carolina Court of Appeals has recognized, unfair competition eludes a precise definition, but "has been referred to in terms of conduct 'which a court of equity would consider unfair.'" *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 400 (1978) (internal citations omitted).

51. "Ordinarily, under section 75-1.1, a mere breach of contract does not constitute an unfair or deceptive act . . . ." *Cullen v. Valley Forge Life Ins. Co.*, 161 N.C. App. 570, 578 (2003). To proceed with such a claim for unfair and deceptive trade practices, "[t]he plaintiff must show substantial aggravating circumstances attending the breach . . . ." *Eastover Ridge, LLC v. Metric Constructors, Inc.*, 139 N.C. App. 360, 368 (2000) (internal quotation and citation omitted). To be sure, "[i]t is 'unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations.'" *Id.* (quoting *Broussard v. Meineke Muffler Discount, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998)).

52. For the purpose of discussing Claims Four and Five, the Court will separate those claims based on conduct alleged to have occurred before termination of the Agreement and after the termination of the Agreement.

*Pre-Termination Conduct*

53. The allegations upon which Plaintiff rests Claims Four and Five are, essentially, allegations that Defendant did not fulfill its obligations under the Agreement. Plaintiff alleges that Defendant prevented the inclusion of enhancements to the Portal, marketed an alternative product to customers, issued marketing information Plaintiff believes to be misleading, and engaged in a course of conduct that resulted in Plaintiff not

being paid as required by the Agreement.[52] Because these allegations are the same ones upon which Plaintiff rests its breach of contract claim, the Court finds that, absent some aggravating or egregious conduct or circumstance, these allegations do not give rise to a violation of G.S. § 75-1.1.

54.     Plaintiff contends that Defendant's marketing of a competing product, FollowMyHealth, to Portal customers was tantamount to "stealing [Plaintiff's] existing customers."[53] This, Plaintiff argues, constitutes an egregious course of conduct or aggravating circumstance so as to give rise to a violation of G.S. § 75-1.1.[54] However, under the terms of the Agreement and the amendments thereto, Defendant had a right to market a competing product upon notice to Plaintiff.[55] Accordingly, the Court finds that exercising this contractual right by offering FollowMyHealth, even to existing customers, is not a sufficiently egregious or aggravating act or circumstance to convert Plaintiff's breach of contract action into a violation of G.S. § 75-1.1. Therefore, as to the alleged pre-termination conduct of Defendant, the Motion to Dismiss Plaintiff's claims under G.S. § 75-1.1 should be GRANTED.

*Post-Termination Conduct*

55.     Plaintiff alleges that following its termination of the Agreement, Defendant made false and misleading statements to customers about the Portal and about Plaintiff's plans to support the Portal.[56] Plaintiff alleges that this conduct caused injury in the form of "lost accounts for End Users that switched to FollowMyHealth, and injury to its reputation and diminution of brand value."[57]

---

[52] Am. Compl. ¶113.
[53] Pl. Memo. Opp. Mot. Dismiss 15.
[54] *Id.*
[55] *See* Agreement § 3.10; First Am. Agreement § 4.
[56] Am. Compl. ¶ 115.
[57] *Id.* ¶¶ 116, 120.

56.     Plaintiff's allegations that Defendant made false and misleading statements about the Portal to Plaintiff's customers at a time when Defendant was offering a directly competitive product are clearly in or affecting commerce as contemplated by G.S. § 75-1.1. *See* G.S. § 75-1.1(b) (defining commerce as "all business activities, however denominated"). In addition, such conduct had the capacity and tendency to deceive. *See Ace Chemical Corp.*, 115 N.C. App. at 247. Finally, Plaintiff alleges that this conduct caused injury in the form of "lost accounts for End Users that switched to FollowMyHealth, and injury to its reputation and diminution of brand value."[58]

57.     Defendant argues that Plaintiff's claims for violations of G.S. § 75-1.1 fail because Plaintiff has failed to "identif[y] a single customer that [Plaintiff] alleges did not do business with [Plaintiff] because of [Defendant's] alleged conduct."[59] At the pleading stage, however, the failure to identify specific customers is not fatal to Plaintiff's claim. Plaintiff has alleged that Defendant's conduct caused specific injury in the form of "lost accounts that switched to FollowMyHealth, and injury to its reputation and diminution of brand value." Accordingly, Plaintiff has sufficiently stated claims for violation of G.S. § 75-1.1 as to the post-termination conduct.

58.     Accordingly, because Plaintiff has pleaded unfair or deceptive acts that occurred after termination of the Agreement, that are in or affecting commerce, and that caused injury, the Motion to Dismiss as to Defendant's alleged post-termination conduct should be DENIED.

THEREFORE, IT IS ORDERED that:

59.     The Motion to Dismiss is DENIED as to Claim One.

60.     The Motion to Dismiss is GRANTED as to Claim Two.

---

[58] Am. Compl. ¶¶ 116, 120.
[59] Def. Memo. Supp. Mot. Dismiss 20-21.

61.     The Motion to Dismiss is GRANTED as to Claim Three.

62.     The Motion to Dismiss is GRANTED, in part, as to Claim Four only to the extent Claim Four seeks recovery for conduct occurring prior to the termination of the Agreement. The Motion to Dismiss is DENIED as to Claim Four to the extent that claim seeks recovery for conduct occurring after the termination of the Agreement.

63.     The Motion to Dismiss is GRANTED, in part, as to Claim Five only to the extent Claim Five seeks recovery for conduct occurring prior to the termination of the Agreement. The Motion to Dismiss is DENIED as to Claim Five to the extent that claim seeks recovery for conduct occurring after the termination of the Agreement.

This the 31st day of March, 2015.